Argued and submitted September 5, decision of Court of Appeals reversed in part; judgment of circuit court affirmed December 28, 2007

STATE OF OREGON,
*Petitioner on Review,*

*v.*

MARTIN ALLEN SHAFF,
*Respondent on Review.*

(CC 220317998; CA A124908; SC S54425)

175 P3d 454

Janet A. Klapstein, Senior Assistant Attorney General, argued the cause and filed the brief for petitioner on review. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Joshua B. Crowther, Deputy Public Defender, Salem, argued the cause and filed the brief for respondent on review. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

KISTLER, J.

KISTLER, J.

The question that this case presents is whether Article I, section 12, of the Oregon Constitution required police officers to give defendant *Miranda* warnings when they went to his home to check on a report of domestic abuse.[1] The trial court held that no *Miranda* warnings were required and denied defendant's motion to suppress his statements. The Court of Appeals reversed, holding that Article I, section 12, required *Miranda* warnings because the circumstances were "compelling." *State v. Shaff*, 209 Or App 68, 146 P3d 389 (2006). We allowed the state's petition for review and now reverse the Court of Appeals decision.

We state the facts consistently with the trial court's factual findings and its decision denying defendant's motion to suppress. *See State v. Juarez-Godinez*, 326 Or 1, 7, 942 P2d 772 (1997) (stating standard). A pizza delivery driver called the police because he was worried about the welfare of one of his customers. He told them that, when he delivered a pizza that evening to defendant's trailer, the woman who answered the door appeared to be injured. At approximately 7:30 p.m., two officers went to check on the woman's welfare. When the officers arrived at defendant's home, they knocked on the door and announced who they were. No one answered, although the officers could hear someone moving around inside. The officers walked around the trailer and "just tap[ped]" on the windows in case someone was in the back room or had not heard the knock. When no one responded, they spoke to the neighbors and then stepped about 30 feet away from defendant's trailer while they talked with each other.

While they were talking, defendant opened the door and looked out. One of the officers called to him as both officers began walking back towards the trailer. As the other officer explained, "it was more of a[n] identification, you

---

[1] Article I, section 12, of the Oregon Constitution is an independent source for warnings similar to those required under the Fifth Amendment to the United States Constitution, as described in *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966). *See State v. Magee*, 304 Or 261, 265-66, 744 P2d 250 (1987) (so stating). For ease of reference, we refer to those warnings as *Miranda* rights or *Miranda* warnings.

know[,] we are here, we want to talk to you." The officers went up to the front porch of the trailer, where they spoke with defendant. Officer Savage told defendant that they had received a report of a dispute and "asked about the woman in the house." The other officer did not remember the exact conversation but explained that "the focus of our response [to defendant] was to make sure that [the woman] was safe." Officer Savage testified that, after their conversation on the front porch, "we ended up going into the house with [defendant]"[2] and that, once inside, he looked down the hallway and saw a woman lying on a bed. Officer Savage went down the hall to check on her, while Officer Crompton remained with defendant.

Officer Crompton stayed at the front door of the trailer, which opened directly onto the living room. He testified that he "had [defendant] have a seat on the couch [in the living room] just to keep things calm and keep things under control." The officer began a "general conversation with [defendant], not * * * regarding the incident * * * just small talk." He then turned to the reason for the officers' presence. He asked defendant whether "they had had an argument tonight," to which defendant replied, "[We] always argue." He then asked if the argument had ever become physical, and defendant said that it had not. Officer Crompton did not press the point. He explained that, "we spoke not only about the incident, but we spoke of other things, general topics that I * * * don't recall." At one point during the conversation, defendant got up and went into the kitchen to get a cigarette or an ashtray.[3]

After approximately 10 minutes, Officer Savage took the woman outside so that they could wait for crisis counselors to arrive. As they walked towards the door, Officer

---

[2] Officer Savage did not remember whether he had asked permission before entering the trailer with defendant. He testified, however, that defendant had raised no objection to the officers' entering with him.

[3] Defendant told the officer that he was going into the kitchen before doing so. On cross-examination, defense counsel asked, "Do you know whether you had told him in advance to do that? I mean, if you are going to move around, let me know or anything like that?" The officer answered, "I would not have told him that, he did that I'm sure just out of courtesy." He later agreed that, alternatively, defendant might have said something because he thought it was expected.

Crompton noticed that the woman had injuries that "were consistent with an assault." He spoke briefly with Officer Savage, who told him that the woman reported that a dog had knocked her down. Officer Crompton resumed his conversation with defendant and again asked if the argument had become physical. He noted that the woman "obviously [had] been assaulted."

Officer Crompton could hear the woman talking outside with Officer Savage. She continued to say that she had fallen. Officer Crompton asked defendant "if he knew why she would say now that she had been assaulted." Defendant looked down at the floor and did not say anything. Officer Crompton then said that "[he] understood and asked him what it was that she had done to anger him." Defendant replied, "[W]e were fighting about me looking at women on TV with big boobs. It's like this every night and it pisses me off. I get so mad that when I start hitting her I can't stop."

Officer Crompton then advised defendant of his *Miranda* rights. He also advised defendant about ORS 133.055(2), which requires officers to arrest a member of a household if they have probable cause to believe that that person has assaulted another member of the household. Officer Crompton asked whether the woman had struck defendant, and defendant said that she had not. He also asked whether defendant had any injuries; defendant said that only his hand was injured. Afterwards, the officers spoke with each other and decided that they had probable cause to arrest defendant and, at that point, placed him under arrest.

The trial court held a pretrial hearing to determine whether the statements that defendant made before Officer Crompton advised him of his *Miranda* rights were admissible. After considering the evidence, the trial court found that defendant "was not free to go and no doubt would have been stopped if he had attempted to leave." The court concluded, however, that the officers' questions were "proper and reasonable in scope." It reasoned that the officers not only needed to determine

"if the injuries were the result of criminal assaultive behavior in which case there might be an arrest, but they needed to determine the nature of the injuries, the cause of the

injuries, who inflicted the injuries and I suppose whether the injuries were justifiable. For example, infl[i]cted in self defense."

The court ruled that the officers reasonably investigated the report made to them, advised defendant of his *Miranda* rights at the conclusion of the investigation, and later arrested him. It followed, the court ruled, that defendant's statements were admissible.[4] After hearing evidence that included those statements, the jury convicted defendant of one count of fourth-degree assault, and defendant appealed from that conviction.[5]

The Court of Appeals reversed that conviction because it concluded that the officers should have advised defendant of his *Miranda* rights sooner than they did. The court explained that three factors that "weigh[ed] heavily in [its] assessment [we]re defendant's physical restraint by the officer's presence in the doorway, coercive overtones in the conduct and the language of the questioning officer, and the confrontation of defendant with incriminating evidence." 209 Or App at 73. Based on those factors, the court held that the circumstances had become "compelling" during Officer Crompton's discussion with defendant and that the officers should have advised defendant of his *Miranda* rights sooner than they did. *Id.* at 75.

■ We allowed the state's petition for review to consider whether the state constitution required *Miranda* warnings during the officers' investigation of suspected domestic

---

[4] At the pretrial hearing, defendant raised two arguments. He argued primarily that the officers should have given him *Miranda* warnings sooner. He also argued that the emergency aid doctrine did not permit the police to enter his home. The trial court rejected the second argument without discussion. Regarding the second argument, Officer Savage had testified that, after speaking with defendant on the front porch, "we ended up going into the house with him." He also had testified that, although he could not remember whether he had asked permission first, defendant did not object to the officers' entering the house with him. Given that evidence, the trial court reasonably could have inferred that defendant had consented to the officers' entry. *See State v. Paulson*, 313 Or 346, 352, 833 P2d 1278 (1992) (trial court could infer from homeowner's failure to ask police to leave that she consented to their entry along with medical personnel). Because the trial court's implicit factual finding negates the premise of defendant's unlawful entry argument, we limit our discussion to his *Miranda* claim.

[5] The jury also convicted defendant of another count of fourth-degree assault, which the Court of Appeals affirmed.

abuse. Article I, section 12, of the Oregon Constitution provides, in part, that "[n]o person shall be * * * compelled in any criminal prosecution to testify against himself." To protect a person's right against compelled self-incrimination, this court has held that, "before questioning, police must give *Miranda* warnings to a person who is in 'full custody' or in circumstances that 'create a setting which judges would and officers should recognize to be "compelling." ' " *State v. Roble-Baker*, 340 Or 631, 638, 136 P3d 22 (2006) (quoting *State v. Magee*, 304 Or 261, 265, 744 P2d 250 (1987)). In this case, defendant does not argue that he was in "full custody." Rather, he contends (and the Court of Appeals agreed) that the circumstances were "compelling" within the meaning of Article I, section 12.

■■ The question whether the circumstances were compelling does not turn on either the officer's or the suspect's subjective belief or intent; rather, it turns on how a reasonable person in the suspect's position would have understood his or her situation. *See Magee*, 304 Or at 265 (stating test objectively). This court recently summarized some of the considerations that bear on that question. *See Roble-Baker*, 340 Or at 640-41 (reviewing cases). In deciding whether a reasonable person would conclude that the circumstances were compelling, this court has considered:

> "(1) the location of the encounter, [*State v.*] *Smith*, 310 Or [1, 7, 791 P2d 836 1990)] (concluding that circumstances were not compelling, in part, because detective met with defendant in noncustodial facility 'in surroundings relatively familiar to defendant'); (2) the length of the encounter, *State v. Prickett*, 324 Or 489, 495, 930 P2d 221 (1997) (concluding that circumstances were not compelling, in part, because '[t]he stop as a whole, and the questions, were brief'); (3) the amount of pressure exerted on the defendant, *State v. Carlson*, 311 Or 201, 205, 808 P2d 1002 (1991) (concluding that circumstances were not compelling, in part, because there was no evidence that 'police coerced or pressured defendant to answer questions'); and (4) the defendant's ability to terminate the encounter, *Magee*, 304 Or at 265."

340 Or at 640-41. In considering those and other factors, the "overarching inquiry is whether the officers created the sort

of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Id.* at 641.

In this case, defendant was not free to leave, as the trial court found. However, the officers detained defendant for only a brief period of time, no more than a typical traffic stop. *See Prickett*, 324 Or at 495 (explaining that the circumstances were not compelling, in part, because "[t]he stop as a whole, and the questions, were brief"); *State v. Vu*, 307 Or 419, 425, 770 P2d 577 (1989) (holding that person stopped for traffic infraction was not in compelling circumstances). Moreover, Officer Crompton questioned defendant in his own home, not in the station house. *Compare Magee*, 304 Or at 265 (finding compelling circumstances when officers held suspect at the police station for questioning), *with Smith*, 310 Or at 7-8 (no warnings required when police questioned suspect in familiar surroundings). This is not to say that questioning that occurs in a person's home can never be compelling. But the fact that the interview occurs in familiar surroundings diminishes the police-dominated atmosphere that *Miranda* warnings were intended to counteract.

Officer Crompton did not raise his voice, threaten defendant, or engage in a show of force. He did not pressure or coerce defendant to answer his questions. Rather, the officers explained to defendant when they arrived that they were there to "make sure that [the woman] was safe." While Officer Savage was performing that task, Officer Crompton spoke with defendant. Although defendant was not free to leave, he got up and went to the kitchen for a cigarette or an ash tray during his conversation with Officer Crompton.

During their discussion, Officer Crompton asked whether defendant and the woman had argued. Defendant said that they had. When defendant also said that the argument had not become physical, the officer did not press the point. Rather, he raised that issue again only after Officer Savage and the woman walked by them as they went outside. At that point, Officer Crompton remarked to defendant that it appeared obvious that the woman had been assaulted. The officer then asked defendant "if he knew why she would say now that she had been assaulted," even though the officer knew that the woman continued to maintain that a dog had

knocked her down. Defendant dropped his head, and the officer told him that he understood and asked what it was that the woman had done to anger him.

Far from engaging in a lengthy or coercive interrogation, Officer Crompton raised the issue whether the argument had become physical only twice during his approximately 10-minute conversation with defendant. The first time, the officer did not pursue the point after defendant's denial. The second time the officer raised the issue he did so only after seeing, and noting, the woman's obvious injuries. This is not a case like *Roble-Baker*, where the officers effectively detained the suspect after questioning her for five to six hours at the police station and continued to confront her with questions that assumed her guilt. *See Roble-Baker*, 340 Or at 643 (after the suspect exclaimed, in response to the officers' statements, "why don't you take me out and hang me," the officers reiterated that "it was real important to tell [them] why she had killed her husband"). Rather, the officer commented only on the woman's evident injuries and then asked a question that implied, inaccurately, that she had reported an assault. Considering all those facts, we conclude that the circumstances were not sufficiently compelling to require *Miranda* warnings. *See Prickett*, 324 Or at 497 (reaching similar conclusion on comparable facts).

As noted, the Court of Appeals reached a different conclusion. 209 Or App at 75. In doing so, it focused on three factors. It noted that Officer Crompton had physically restrained defendant, that there were "coercive overtones" in the officer's actions and questions, and that the officers had confronted defendant with incriminating evidence. *Id.* at 73. We review each of those considerations in turn.

First, the Court of Appeals explained that Officer Crompton had "physically restrain[ed]" defendant by standing in the doorway. *Id.* at 73. There was, however, no physical restraint in the ordinary sense of those words. Although defendant was not free to leave, the detention was no more coercive or lengthy than a typical traffic stop. This court has never held that that minimal level of restraint—without more—is sufficient to make the setting a compelling one. *See*

*Prickett,* 324 Or at 497; *Vu,* 307 Or at 425 (illustrating proposition).[6]

Second, the Court of Appeals reasoned that the officers' conduct had "coercive overtones." 209 Or at 73. To the extent that the Court of Appeals' conclusion rests on its perception that the officers spoke in an overbearing or coercive manner, we think that the court failed to heed the applicable standard of review. What the officers said and the manner in which they said it are both questions of historical fact, which we presume the trial court resolved consistently with its express factual findings and ruling. *See Juarez-Godinez,* 326 Or at 7 (stating standard of review). The record supports the trial court's implicit finding that the officers acted in an appropriate and courteous manner in carrying out an inquiry into a citizen's welfare.

The Court of Appeals observed that the officers' actions had coercive overtones for an additional reason—one of the officer's questions had a false premise. To the extent that the Court of Appeals found the question coercive because its premise was false, the court erred. As noted, the question whether the circumstances were compelling does not turn on what the officer subjectively intended but on how a reasonable person in the suspect's position would have understood his or her situation. It follows that the question is not whether the officer knowingly made a false statement but what effect the information that the statement conveyed would have had on a reasonable person in the suspect's position.[7]

---

[6] In reaching a different conclusion, the Court of Appeals stated that "[d]efendant was so restrained in his own home that he reasonably felt compelled to ask the officer for permission to go to the kitchen, and the officer demonstrated his control over defendant's physical environment when he affirmatively granted permission." 209 Or App at 73. The Court of Appeals' statement is not consistent with the record and the trial court's implicit factual findings on that matter. *See* note 3 above (setting out officer's testimony on this issue).

[7] We recognize, as the United States Supreme Court explained in *Miranda,* that police officers can use false statements as an interrogation technique to coerce a suspect subject to custodial interrogation into confessing. *See* 384 US at 453 (describing practice). The officer's statements here did not rise to that level, nor are they sufficient, in the larger context in which the questioning occurred, to make the setting a compelling one for the purposes of Article I, section 12. *See Oregon v. Mathiason,* 429 US 492, 97 S Ct 711, 50 L Ed 2d 714 (1977) (reasoning that false statement that officer had found suspect's fingerprints at the crime scene did not

In this case, Officer Crompton asked defendant "if he knew why [the woman] would say now that she had been assaulted." The officer's question falsely posited that the woman had reported an assault, and defendant reasonably could have inferred that the officer suspected that he was the person who had committed it. The officer's question had a potentially coercive effect, not because its premise was false but because of the information it conveyed. Properly considered, the officer's question is relevant to the third factor that the Court of Appeals noted in holding that the circumstances had become compelling—whether the officers had confronted defendant with evidence of his guilt—and we turn to that factor now.

In discussing evidence of guilt, the Court of Appeals failed to distinguish evidence of a defendant's guilt from an officer's coercive use of that evidence. Two of this court's cases, *Prickett* and *Roble-Baker*, illustrate the distinction. In *Prickett*, the officer lawfully had stopped the defendant. 324 Or at 491. As soon as he approached the defendant's car, the officer detected the odor of alcohol on the defendant's breath and noticed that the defendant's eyes were watery and bloodshot. *Id.* The officer asked the defendant to perform field sobriety tests (a request from which the defendant reasonably could have inferred that the officer suspected he had been driving while impaired), and the defendant performed poorly on two of the four tests that the officer administered.[8] *Id.* After that, the officer questioned the defendant, who later sought to suppress his answers claiming that, by that point, the circumstances had become compelling.

When the officer questioned the defendant in *Prickett*, there was substantial evidence, apparent to both the defendant and the officer, that the defendant had committed the crime of driving under the influence of intoxicants. If evidence of guilt were sufficient by itself to create compelling circumstances, then the officer in *Prickett* should have advised

---

mean that the suspect was in custody for the purposes of the federal *Miranda* requirement).

[8] The defendant performed poorly on a balance test and failed the horizontal gaze nystagmus test. 324 Or at 491. Although the defendant would not necessarily have been aware that he failed the latter test, he presumably would have been aware that he had difficulty maintaining his balance.

defendant of his *Miranda* rights before questioning him. This court, however, held that no *Miranda* warnings were required; it explained that "a court must look at *all* the circumstances in which the purportedly compelled statement was made." *Id.* at 495 (emphasis added). It considered the length of the stop, the location of the stop, and whether there "was any heightened level of activity by the trooper, such as a drawn gun or a loud tone of voice." *Id.*

Conversely, in *Roble-Baker*, the officers had questioned the suspect for five to six hours at police headquarters after finding her husband's body buried in the backyard of her former home. 340 Or at 633, 643. The suspect twice had asked to suspend the interview, without success, and the detective repeatedly had asked the suspect questions that assumed her guilt. *Id.* After the officers reviewed the information available to them, the suspect exclaimed, "why don't you take me out and hang me." *Id.* The suspect left the interview room, but the officers followed her, and the detective continued to tell her that "it was real important to tell [them] why she had killed her husband" and asked, "Did he deserve that?" *Id.* This court held that, in those circumstances, the detective's repeated use of questions that assumed the suspect's guilt contributed to a compelling setting that required *Miranda* warnings. *Id.* at 643-44.

*Prickett* and *Roble-Baker* teach that what matters is not whether evidence of guilt was apparent to the suspect; rather, it is whether the officers used that evidence in a coercive manner. In this case, Officer Crompton raised the issue whether the argument had become physical only twice during his approximately 10-minute conversation with defendant. The first time, the officer did not pursue the point after defendant's denial. The second time the officer raised the issue, he did so only after seeing, and noting, the woman's obvious injuries. The officer's questions were not coercive, aggressive, or repetitive. Indeed, the last question that the officer asked was sympathetic. Given the location of the encounter, the brief time that it lasted, and the absence of any "heightened level of activity" by the officers, evidence that an assault had occurred (whether apparent to defendant or reflected in the officer's questions) is not sufficient to say

that the officers had placed defendant in compelling circumstances that required *Miranda* warnings under the Oregon Constitution. The trial court correctly ruled that Article I, section 12, did not require the officers to give defendant *Miranda* warnings sooner than they did. The Court of Appeals erred in reversing defendant's assault conviction.[9]

The decision of the Court of Appeals is reversed in part. The judgment of the circuit court is affirmed.

---

[9] As noted, the jury convicted defendant of two assaults. The Court of Appeals reversed one conviction but affirmed the other one.