Submitted July 28, affirmed October 26, 2011

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MICHELLE DAWN NORTHCUTT,
*Defendant-Appellant.*

Multnomah County Circuit Court
090230608; A143278

268 P3d 154

Peter Gartlan, Chief Defender, and Stephanie J. Hortsch, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Erika L. Hadlock, Senior Assistant Attorney General, filed the brief for respondent.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Armstrong, Judge.

HASELTON, P. J.

**HASELTON, P. J.**

Defendant, who entered a conditional guilty plea, ORS 135.335(3), for trademark counterfeiting in the second degree, ORS 647.145, appeals. She assigns error to the trial court's denial of her motion to suppress evidence, including inculpatory statements that she made during an interview with FBI agents. Defendant contends that suppression is required because the agents failed to give her *Miranda* warnings and the interview either (a) evinced "compelling circumstances" for purposes of Article I, section 12, of the Oregon Constitution,[1] or (b) constituted "custodial interrogation" for purposes of the Fifth Amendment to the United States Constitution.[2] The trial court rejected both of these contentions, and so do we. Accordingly, we affirm.

In denying suppression, the trial court rendered comprehensive findings. Reviewed consistently with those findings, *see State v. Shaff*, 343 Or 639, 641, 175 P3d 454 (2007), the record discloses the following material facts. In October 2008, defendant planned and advertised a "purse party," at which she intended to sell purses, shoes, and clothes that bore designer trademarks without authorization. The event was to be held at a motel secured by an associate of defendant—who, unbeknownst to defendant, was an FBI informant. The informant, who "hosted" the event, invited FBI agents to attend.

On the day of the party, the first two agents, who were in plain clothes, entered the suite with the informant's permission. Upon entering, the agents identified themselves as FBI agents and showed defendant their credentials. The agents saw purses, shoes, and clothes on display in both the front room of the suite and the back bedroom,[3] as well as a

---

[1] Article I, section 12, provides, in part, that "[n]o person shall * * * be compelled in any criminal prosecution to testify against himself." Article I, section 12, "is an independent source for warnings similar to those required under the Fifth Amendment to the United States Constitution, as described in *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966)." *State v. Shaff*, 343 Or 639, 641 n 1, 175 P3d 454 (2007) (citing *State v. Magee*, 304 Or 261, 265-66, 744 P2d 250 (1987)).

[2] The Fifth Amendment provides, in part, that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself[.]"

[3] The suite contained a front living room and kitchen area, as well as a back bedroom with an adjacent bathroom.

credit card machine. Shortly after the first agents entered the suite, they were joined by four to five more agents and one local police detective. All of the law enforcement personnel wore "soft or casual" clothing, and none displayed a gun or handcuffs.[4]

The agents did not arrest defendant. Nor did they inform defendant of her *Miranda* rights, either initially or at any time during the ensuing encounter. Rather, one agent asked defendant to go into the bedroom so that two other agents, Grubb and Swansinger, could ask her some questions while the other agents inventoried the merchandise in the front room. The agents did not tell defendant that she was not required to answer their questions or that she was free to leave.

Defendant went into the bedroom, and Grubb and Swansinger followed. Defendant and both agents sat down, with Swansinger taking notes from a stool near the door to the bedroom and Grubb asking most of the questions from a chair closer to defendant. The bedroom door was closed during the questioning, except when agents involved in inventorying the merchandise in the living room would enter the bedroom to speak with Grubb and Swansinger.[5] Consequently, the agents in the front room were generally not visible to defendant as she responded to Grubb's questions.

The questioning lasted approximately one and one-half hours. During that time, defendant did not ask to leave or attempt to leave. At the outset, Grubb explained to defendant that selling counterfeit items is an offense and that the agents were investigating defendant's conduct in that regard. In response, defendant immediately admitted that she had offered the merchandise for sale and that she "understood it is illegal to sell counterfeit merchandise." During the balance of the interview, defendant answered questions about the

---

[4] At the suppression hearing, defendant testified, "I believe one officer did have a gun, and I'm not for certain if it was on the hip or if it was on the back." Defendant also testified that she did not recall whether she saw any handcuffs.

[5] Thus, if defendant had undertaken to leave the suite, she would have needed to first move past both Grubb and Swansinger, who were seated near the closed bedroom door, and then, leaving the bedroom, move past nearly a half-dozen more law enforcement officers in the living room.

details of her business, including the identities of her suppliers and other individuals who sold similar merchandise.

According to Grubb, "[o]ur attitude and tone was very polite, very friendly. We were very cordial." Defendant agreed: "[W]hen they were questioning me, they were very cordial, very nice."[6] For her part, defendant was emotional, remorseful, and "on the border of tearful" at times. However, she never asked to take a break from the questioning.

After the agents completed their questioning, they told defendant that she was free to go. When defendant entered the living room, one of the agents there asked her to "stick around" the suite to sign an inventory receipt for the seized items. Defendant complied, which took another 20 to 30 minutes. Thus, the entire encounter lasted approximately two hours.

Defendant was charged with second-degree trademark counterfeiting, ORS 647.145.[7] She subsequently moved to suppress evidence obtained during the encounter at the motel, including her statements to the agents and derivative evidence. Defendant contended that the agents' entry was an unlawful warrantless search and that her statements were involuntary.[8] In addition, defendant raised the *Miranda*-based contention that is the focus of this appeal. Specifically,

---

[6] During the course of the questioning, Grubb offered defendant a beverage and, when she asked for water, Grubb sent Swansinger to get a bottle of water from the kitchen.

[7] ORS 647.145 provides, in part:

"(1) A person commits the crime of trademark counterfeiting in the second degree if the person:

"(a) Commits trademark counterfeiting as described in ORS 647.135 and:

"(A) Has one prior conviction for trademark counterfeiting in any degree;

"(B) The total number of items bearing the counterfeit mark is more than 100 but less than 1,000; or

"(C) The total retail value of all of the items bearing the counterfeit mark * * * is more than $1,000 but less than $10,000."

In turn, ORS 647.135(1) provides, in part:

"A person commits trademark counterfeiting if the person knowingly and with the intent to sell or distribute and without the consent of the registrant uses, displays, advertises, distributes, offers for sale, sells or possesses any item that bears a counterfeit of a mark * * * with knowledge that the mark is counterfeit."

[8] The trial court ultimately concluded that the warrantless entry was lawful and the confession was voluntary. On appeal, defendant does not contest those rulings.

defendant asserted that her statements must be suppressed because, without having been advised of her *Miranda* rights, she was questioned "behind a closed door, with numerous FBI agents on the premises" under circumstances that "made it clear she was suspected of a crime."

At the hearing on the motion, evidence of the circumstances recounted above was presented. Regarding the events at the motel, defendant testified, "I thought it was a raid. I thought it was a bust." She stated that, as soon as the agents entered the motel, she immediately realized that she was "in danger of criminal prosecution" and that she did not feel free to leave during the encounter. Conversely, the agents testified that defendant was free to leave at any time during the encounter and that they did not intend to arrest her at that time and place. When asked by her attorney why she confessed, defendant stated, "As funny as it may sound, doing an illegal activity, I'm still an honest person." When the state clarified on cross-examination, "[Y]ou confessed because you felt guilty about having committed the crime?" defendant responded, "Yes, sir."

The trial court denied suppression. Addressing defendant's compelling circumstances argument, the court stated that "the circumstances that even merit consideration as compelling [are] the number of officers and the layout of the room with the defendant's understandable expectation that she was being interrogated." Although the court made no explicit finding regarding defendant's actual freedom to leave, it did find that the agents "could have arrested her"[9] and further determined that defendant reasonably believed that she was not free to leave. Nevertheless, the court ultimately concluded that the circumstances were not compelling because "almost all [of] the evidence in this case supports the State's view of a * * * low-pressure environment." Accordingly—and, presumably, implicitly rejecting defendant's custodial interrogation argument under the Fifth Amendment for similar reasons—the trial court denied defendant's

---

[9] *Accord Holcomb v. Hill*, 235 Or App 419, 434, 233 P3d 448, *rev den*, 349 Or 370 (2010) (the fact that "throughout the conversation, [an officer] had probable cause to arrest [a suspect] * * * does not render the circumstances so compelling as to require the giving of *Miranda* warnings").

motion to suppress. Defendant then entered a conditional guilty plea, reserving an appellate challenge to that ruling.

On appeal, defendant renews her contentions that the failure to administer *Miranda* warnings compels suppression under either Article I, section 12, or the Fifth Amendment. With respect to the former, she posits that the circumstances of the interview were compelling because of the length of the encounter, her reasonable belief that she was unable to terminate the encounter, the number of agents involved, the physical layout of the participants during the interview, and Grubb's explicit reference to defendant's guilt. For the same reasons, defendant asserts that she was subject to custodial interrogation for Fifth Amendment purposes. The state responds that the circumstances were not compelling—and there was no custodial interrogation—because the agents were cordial, the questioning was noncoercive and occurred in a low-pressure environment, and defendant was, in fact, free to leave.

The principles that frame our review are ostensibly simple. Under Article I, section 12, *Miranda* warnings are required prior to a custodial interrogation *and* when a suspect is under "compelling" circumstances that do not rise to the level of full custody. *State v. Magee*, 304 Or 261, 265, 744 P2d 250 (1987). Under the Fifth Amendment, *"Miranda* warnings must be given when a person is 'in custody,' *i.e.,* when a person's freedom has been 'significantly restrained[.]' " *State v. Smith*, 310 Or 1, 8, 791 P2d 836 (1990) (citations omitted). Whether the totality of the circumstances, as found by the trial court, was "compelling" or constituted custodial interrogation is a question of law. *State v. Bush*, 203 Or App 605, 608, 126 P3d 705 (2006).

We begin with the "compelling circumstances" inquiry. *See Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981) ("The proper sequence is to analyze the state's law, including its constitutional law, before reaching a federal constitutional claim."). In assessing whether compelling circumstances existed, our "overarching inquiry is whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *State v. Roble-Baker*, 340 Or 631, 641, 136 P3d 22 (2006). That

inquiry, in turn, refers to a variety of nonexclusive factors, including: (1) "the location of the encounter"—that is, whether the venue was "familiar" to the suspect or subject to police control; (2) "the length of the encounter"; (3) "the amount of pressure exerted on the defendant," including, *e.g.*, officers' affect and whether officers confronted the suspect with evidence of guilt in a "coercive" manner; and (4) "the defendant's ability to terminate the encounter." *Id.* at 640-41 (citations omitted). Consistently with that construct, predicated on a mix-and-match assessment of the totality of the circumstances, no single factor will—except in the most extreme case—be dispositive.

*Roble-Baker* and *Shaff* are exemplary—and, as will become apparent, especially inform our analysis. In *Roble-Baker*, the remains of the defendant's husband were discovered buried in the backyard of one of the defendant's former residences. Police detectives went to the defendant's place of work to ask if she would be willing to answer their questions. 340 Or at 633. The defendant agreed to be interviewed and accepted a ride to police headquarters, which was a 20- to 25-minute drive. The detectives did not warn the defendant of her *Miranda* rights either during the drive or during the ensuing nearly six hours of questioning that culminated in the defendant's confession. *Id.*

The tenor of the police station interview was (at least initially) "relaxed," with the defendant taking multiple bathroom and cigarette breaks. *Id.* at 634. Two and one-half hours into the interview, a detective told the defendant that "she'd always been free to leave." *Id.* at 635. Approximately four hours into the interview, the defendant indicated that she wanted to go home, but the detectives disregarded her request and continued questioning her. *Id.* at 635-36. At that point, as a practical matter, the defendant could not leave because her car was still at her workplace and her elementary school-aged son was also being interviewed by police detectives. *Id.* at 642.

Approximately five hours into the interview, the defendant, emotional and exasperated, stood up and said, "Well, why don't you just take me out and hang me?" and then went outside to smoke another cigarette. *Id.* at 636

(internal quotation marks omitted). One of the detectives followed her outside and "told her to tell him why she had killed her husband." *Id.* The detective persisted in asking the defendant guilt-assuming questions, such as, "Did he deserve that?" *Id.* at 637 (internal quotation marks omitted). Between five and six hours into the interview, the defendant said, "I hope I'm doing the right thing" and then confessed to killing her husband. *Id.* (internal quotation marks omitted).

The defendant filed a motion to suppress her inculpatory statements, arguing that her confession was involuntary and violated her right against self-incrimination under both the Oregon and United States constitutions. The trial court denied the defendant's motion to suppress, and, in reviewing the defendant's subsequent conviction for manslaughter, we affirmed that ruling. *State v. Roble-Baker*, 195 Or App 415, 99 P3d 1239 (2004), *rev'd*, 340 Or 631, 136 P3d 22 (2006).

The Supreme Court reversed. *Roble-Baker*, 340 Or at 644. In so holding, the court assessed the factors summarized above, *see* 246 Or App at 245, and determined that the circumstances of the interrogation became compelling only at the point, more than five hours into the police station interview, when the detective asked, "Did he deserve that?" *Roble-Baker*, 340 Or at 643-44. Accordingly, the Supreme Court held that the defendant's statements after that point—but not those elicited during the preceding (approximately) five hours—must be suppressed. *Id.*

The court's disposition depended on the *cumulative* effect of a variety of factors, with the detective's persistent questioning that "assumed her guilt" finally tipping the circumstances from noncompelling to compelling:

> "[D]efendant had spent five to six hours at police headquarters. She had asked to suspend the interview twice, both times without success. For all practical purposes she could not leave police headquarters, * * * and Newell had continued to press defendant by asking questions that assumed her guilt. * * * [A]t the point Newell asked defendant, 'Did he deserve that,' the detectives had created the

> sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract. Because the circumstances then became compelling and because the detectives failed to advise defendant of her *Miranda* rights, all defendant's statements after Newell asked her, 'Did he deserve that,' should have been suppressed."

*Id.* Necessarily implicit in *Roble-Baker*'s analysis and disposition—and of particular pertinence to our consideration—is the conclusion that the circumstances of police questioning over a five-hour period, even in a custodial setting from which the suspect was not, as a practical matter, able to leave, were not "compelling" until the interviewing officers failed to honor the suspect's efforts to suspend or end the encounter and, instead, engaged in coercive interrogation techniques.

In *Shaff*, the Supreme Court, with substantial reference to *Roble-Baker*, focused on the proper content of the third of the *Roble-Baker* compelling circumstances factors, *viz.*, "the amount of pressure exerted on the defendant." 340 Or at 640. There, two officers, Crompton and Savage, went to the defendant's home to complete a welfare check in response to a phone call. *Shaff*, 343 Or at 641. When the officers entered the defendant's home, Savage went into the bedroom to check on a woman who was present while Crompton instructed the defendant to take a seat on the couch in the living room and questioned the defendant about his interaction with the woman. *Id.* at 642. The defendant admitted to arguing with the woman, but he denied having physically assaulted her. After approximately 10 minutes, Savage and the woman, who displayed visible injuries, walked through the living room on their way outside. Crompton then again asked the suspect whether the argument had been physical, noting that the woman "obviously [had] been assaulted." *Id.* at 643 (brackets in original). Although Crompton knew from Savage that the woman maintained that her injuries had occurred when a dog knocked her down, he asked the defendant "if he knew why she would say now that she had been assaulted." *Id.* In response to those questions, the defendant admitted to hitting the woman, at which point Crompton advised the suspect of his *Miranda* rights and, after further questioning, placed him under arrest. *Id.*

The trial court denied the defendant's motion to suppress his statements antedating the *Miranda* warnings, and the defendant was subsequently convicted of fourth-degree assault. On appeal, we reversed, concluding that the circumstances of the questioning were compelling. *State v. Shaff,* 209 Or App 68, 146 P3d 389 (2006), *rev'd in part,* 343 Or 639, 175 P3d 454 (2007).

The Supreme Court, on review, disagreed. Although the Supreme Court referred to other factors—*e.g.,* that the questioning occurred at the defendant's house, not the police station, *Shaff,* 343 Or at 646, and that, although the defendant was not free to leave, "the detention was no more coercive or lengthy than a typical traffic stop," *id.* at 647—it primarily addressed the allegedly "coercive" character of the questioning. Specifically, the court highlighted the distinction between "evidence of a defendant's guilt [and] an officer's coercive use of that evidence." *Id.* at 649. In that regard, the court contrasted the circumstances in *Shaff* with those in *Roble-Baker,* emphasizing that the critical feature in the latter was "the detective's repeated use of questions that assumed the suspect's guilt[.]" *Id.* at 650. In contrast, in *Shaff,* the officer's questions and remarks to the defendant—including his references to the victim's visible injuries, his statement that the victim had "obviously been assaulted," and his false representations that the victim had acknowledged that she had been assaulted—"were not coercive, aggressive, or repetitive." *Id.* Accordingly, *Shaff*'s teaching, as we understand it, is, at least, that mere reference to evidence of a suspect's guilt in the course of nonaggressive questioning that does not "assume the suspect's guilt" is not sufficiently coercive to give rise to compelling circumstances.

We return to the circumstances of this case. Defendant acknowledges, correctly, that the first *Roble-Baker* factor, location, is "neutral." To be sure, the motel suite may not have been "familiar" to defendant in the sense that a residence would be, but neither was it akin to a police station or custodial facility.

With respect to the second, durational factor, the total time between the beginning of the encounter and the

end of the agents' questioning of defendant was approximately an hour and a half.[10] Although that may be longer than the duration of many encounters between police and citizens, no Oregon court has held that the mere passage of time is sufficient to demonstrate compelling circumstances. Indeed, as noted above in *Roble-Baker*, a duration of over five hours in an explicitly police-controlled venue did not, without more, give rise to compelling circumstances. Rather, any consideration of the durational factor is necessarily dependent on the character or quality of the interaction. A very short, but extremely coercive, encounter will be deemed "compelling," *see, e.g.*, *State v. Shirley*, 223 Or App 45, 50-51, 195 P3d 457 (2008) (officer-dominated one-minute interview on a public sidewalk deemed compelling); conversely, as is evident from the court's treatment of the first one to five hours of the questioning in *Roble-Baker*, a relatively long and benign encounter will not be so characterized. Except in an otherwise close case in which duration may serve as a sort of tiebreaker, the principal emphasis is properly on the qualitative dynamics addressed in the third and fourth of the *Roble-Baker* factors.

As illuminated in *Shaff*, the gravamen of the third *Roble-Baker* factor is the use of aggressive and coercive police interrogation practices, especially including, but not limited to, those explicitly predicated on assumptions of a suspect's guilt or calculated to contradict a suspect's assertions of innocence. Here, nothing of that sort occurred. There is no suggestion in the record that defendant ever denied her guilt. Instead, prompted by her own sense of guilt, defendant readily confessed at the outset. Thus, the agents did not insist upon defendant's guilt in the face of any initial, much less persistent, denial on her part. Nor did they engage in coercive, aggressive, or repetitive questioning, challenging defendant's statements. Rather, by defendant's own admission, the agents were "very cordial, very nice" throughout. Thus, the third factor militates strongly against suppression.

*State v. Machain*, 233 Or App 65, 68, 225 P3d 75 (2009), which defendant invokes, corroborates that

---

[10] As noted, the duration of the encounter in its totality was two hours, but the final 20 to 30 minutes did not involve any questions eliciting inculpatory responses.

understanding of the essential quality of a "coercive" encounter. In *Machain*, as pertinent here, the defendant had previously provided detectives with a statement regarding the death of her nephew. She subsequently agreed to another interview, which lasted about two and one-half hours. *Id.* at 68. At the outset, the interviewing detective's affect was "fatherly and friendly" but, especially after the first detective was joined by a second detective, triggering a sort of "tag-team" approach, the detectives accused the defendant of being untruthful, with the second detective telling the defendant, "I hear you lying [in the initial interview]. So, now it's time to tell the truth" and telling the defendant that the district attorney's office "know[s] you lied." *Id.* at 68, 69. In the ensuing colloquy, the detectives "repeatedly told [the] defendant that they would be able to disprove any falsehood" (including through fingerprint evidence) and "repeatedly asked questions that assumed [the] defendant's guilt." *Id.* at 75-76. Our reversal in *Machain* was predicated on that coercive dynamic. Again, nothing of that sort occurred here.

The fourth *Roble-Baker* factor—"the suspect's ability to terminate the encounter"—is less clear-cut. The agents, as noted, testified that defendant was, in fact, free to leave at any time, *see* 246 Or App at 244, but the trial court expressly determined that defendant reasonably believed that she was not free to leave. *Id.* It is undisputed that the agents never told defendant (before the end of the interview) that she was free to leave and that defendant did not, in fact, attempt to leave.[11] Assuming, without deciding, that the fourth *Roble-Baker* factor pertains to a suspect's objectively reasonable belief, and not to law enforcement officers' undisclosed intentions, that factor supports a determination that the circumstances were compelling.

Notwithstanding that application of the fourth *Roble-Baker* factor, we agree with the trial court that the circumstances, viewed in their totality, did not produce "the sort of police-dominated atmosphere that *Miranda* warnings

---

[11] Here, in contrast to *Roble-Baker*, where the defendant had to rely on the police for a ride from the police station because her car was still at her workplace, defendant's car was parked in the motel parking lot. 340 Or at 642. *Accord Machain*, 233 Or App at 72 ("[Defendant] had been given a ride to the police station by officers and was reliant on them for transportation.").

were intended to counteract." *Roble-Baker*, 340 Or at 641. That is so because of the complete lack of any sort of aggressive, overbearing, or coercive questioning, including (especially) with respect to defendant's damning admission of guilt at the very outset of the interview.

Finally, defendant offers no reason why, in these circumstances, she could prevail under the Fifth Amendment if not under Article I, section 12, and we perceive none. Accordingly, the trial court properly denied defendant's motion to suppress.

Affirmed.