No. 463 May 28, 2026 109

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DANIEL JOSEPH MITCHELL,
*Defendant-Appellant.*

Deschutes County Circuit Court
22CR48327; A183276

Beth M. Bagley, Judge.

Argued and submitted September 8, 2025.

Stephanie Hortsch, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Kyleigh Gray, Assistant Attorney General, argued the cause for respondent. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Egan, Judge, and Pagán, Judge.

PAGÁN, J.

Reversed and remanded.

**PAGÁN, J.**

Defendant appeals from convictions, after a jury trial, of multiple sexual offenses,[1] asserting that the trial court erred in denying his motion to suppress incriminating statements he made to Deschutes County deputy sheriffs during a late-night interview at the Deschutes County Sheriff's office, before he had been given *Miranda* warnings. Defendant contends, in a single assignment of error, that the trial court erred in denying the motion to suppress, because the interview was conducted under compelling circumstances, in violation of Article I, section 12, of the Oregon Constitution. We agree with defendant that the circumstances of defendant's interview were compelling and therefore required *Miranda* warnings. Thus, we conclude that the trial court erred in denying defendant's motion to suppress, and we therefore reverse defendant's convictions and remand for further proceedings.

We summarize the evidence presented on defendant's motion, which included video from police bodycams as well as a transcription of defendant's police interview. Defendant lived at home with his wife, her three young children, and his two young children, a daughter A, six years old, and a son K, nine years old. A and K shared a bedroom and had bunk beds. The children's bedtime was approximately 8:00 p.m.

At about 9:15 p.m., three Deschutes County deputy sheriffs, including one in uniform, came to defendant's home in response to a call about suspected sexual abuse of one of defendant's children. Defendant came to the door, and Deputies Houston and Bilyeu asked to come inside to talk to defendant. Defendant suggested that they talk outside, because the children were inside. The deputies agreed and thus spoke with defendant briefly on his porch; they told him that one of the children had reported to her mother

---

[1] Defendant was convicted of two counts of first-degree sexual penetration, ORS 163.411(1)(b), three counts of first-degree sodomy, ORS 163.405(1)(b), three counts of incest, ORS 163.525, and two counts of first-degree sexual abuse, ORS 163.427(1)(a)(A), stemming from multiple incidents in which he subjected his then six-year-old daughter to sexual contact by touching her vagina and encouraging her to touch and suck his penis. He was sentenced to multiple consecutive sentences, for a total of 1,200 months' imprisonment.

(defendant's wife) that she had seen defendant act inappropriately toward one of his children. The deputies told defendant that they needed to speak to everyone involved and that it was "really important" that they get accurate information.

Defendant said he was willing to speak to them. It was a cold evening. The deputies suggested that it would be better to talk at the county sheriff's office, where there were professionals who could facilitate the conversation, and they asked defendant if he was willing to meet them there for an interview; he responded that he was, if it was needed. Houston told defendant that he thought it was "very necessary," because the accusations needed to be addressed and "we don't want allegations * * * against you if they're not true, right?"

With the deputies following him, defendant drove to the county sheriff's office, where the deputies met him. The office building is next to the jail and was closed, after hours. The deputies led defendant through three locked doors into a small windowless interview room. The deputies told defendant that the doors could be opened for exiting and that he could leave at any time. A deputy described the way out of the building should defendant decide to leave. In the interview room, Detective Turkington, who was casually dressed, asked defendant to sit in the chair closest to the door so that his exit would not be blocked should he decide to leave.

Turkington then left defendant in the room by himself for approximately 20 minutes, and the interview began at about 10:00 p.m., with Turkington and Deputy Bilyeu. The two officers brought defendant coffee and water at his request, and they confirmed with defendant at the start of the interview that he was comfortable speaking with them.

For approximately two hours, Turkington and Bilyeu chatted casually with defendant about various topics, including parenting techniques, the struggles of defendant's wife's children to overcome possible abuse by their father, defendant's relationship with his wife's children, and the stock market. The trial court found that defendant was calm and conversational throughout, as were the deputies. Defendant shared openly about his relationship with

his wife and his past difficult relationship. The trial court described Turkington and Bilyeu's tone as "remarkable," in that it almost did not seem to be an investigation. Defendant responded to questions and did not appear stressed. The trial court described the conversation as "rapport building."

After approximately two hours, defendant mentioned that he was tired and that he usually went to bed around 10:00 p.m. and woke up at 5:30 a.m. He asked how much longer, and Turkington said not much longer. The trial court found that Turkington's tone remained calm and that defendant never requested to end the interview. The deputies took a 15-minute break, during which defendant left the room and then returned voluntarily.

After the break and at approximately midnight, Turkington reintroduced the allegations of abuse of defendant's six-year-old daughter, A. Bilyeu, who had not been present the entire time, stayed in the room. Turkington asked defendant, "So what's your understanding of why we're here tonight?" Defendant said he did not know but that he presumed it was related to a conversation he had had with his wife "about stuff going on with the kids." Turkington said he really appreciated defendant coming in and being open with the deputies. He told defendant, "I feel like, after getting to know you, we—we may be able to clear this up because of how you value honesty, right?" Defendant explained that he talked to his wife and told her that maybe A had seen him adjusting himself. He described how, after talking to his wife, he apologized to A, "for what was concerning her." The deputies asked for more details, and defendant explained that A had come looking for defendant to report that the youngest child was not in bed. Defendant told Turkington that he could imagine that A saw him making "an adjustment" to his pants.[2] Then, in a relaxed conversational manner, Turkington and defendant discussed the children's bedtime routine. Turkington asked defendant if A might have seen him "adjusting" or scratching his private

---

[2] Defendant told Turkington:

"I was like, "Well, I don't know if she—if I'm adjusting my pants and she saw a part of my butt or something, or if she—I'm just adjusting my—my stuff—[.]"

parts, and defendant said that he did not remember that specifically.

Turkington continued the conversation with defendant, asking defendant if A is generally honest. Turkington told defendant that he knew that defendant valued his relationships with his children and valued honesty and did not want to hurt his children. Turkington and defendant spoke for several minutes about other topics, including how the children were doing in school and behavioral issues.

Turkington then returned the conversation to defendant's care for the children, his relationship with them, his desire not to hurt them, and his desire to keep them safe. He asked defendant what it would be like for the children if defendant wasn't around. Turkington encouraged defendant to share more information and said that if A's allegations were not cleared up, they could become "exaggerated" and cause defendant to lose contact with his children. Defendant answered that that was a scary thought.

Turkington then shared his own opinion that if A had seen defendant merely "adjusting" himself, it would not likely have been a cause of concern for the child.[3] Defendant

_____

[3] Turkington continued to try to persuade defendant to share more information. He told defendant,

"[T]here's a lot on the line. And we're not trying to trick you into anything here. What we're trying to do is find out the truth."

Turkington told defendant that law enforcement relies heavily on science, and that there are techniques such as DNA and video that help to solve crimes, especially those involving bodily fluids such as semen and sperm. Turkington continued, saying that they were not trying to tear families apart and that relationships can be resolved, such as when, as defendant had described to the deputies, there was a concern that A had been abused by a parent. Although there may be scars, Turkington told defendant that forgiveness is "the miracle about humanity."

Turkington then asked defendant,

"I'm curious what—what happened in that room. I think more than just you adjusting yourself, because, you know, kids see us—we adjust ourselves around them. That's *** not *** something that would freak [a child] out to the extent that she would go to her mom, right?"

Defendant agreed. Turkington continued,

"So I—I have a feeling that more than just, you know, you were adjusting your belt or you were adjusting your private parts was—was happening there."

He told defendant, "[W]e value honesty. ***. I feel like you've been honest with us a lot tonight[.]"Turkington then told defendant that he believed defendant was omitting part of the story.

agreed. Rather, the deputy pressed, he believed that defendant was not telling the whole story, and that he was doing more than merely adjusting himself. The deputy remarked again that he knew that defendant was not trying to hurt his kids but emphasized that it was important to find out exactly what had happened in the bedroom. Turkington told him, "I feel like you're leaving out maybe a couple details of what happened last night." Defendant responded, "Well the idea of what's being said is pretty uncomfortable to address from any point." Turkington acknowledged defendant's discomfort and apologized for seeming "crass." But defendant told the deputies that he appreciated "what you guys are doing." Turkington told defendant, "[O]nce we can identify what happened *** everything that happened, then we can deal with it." Defendant acknowledged that. Both deputies told defendant that, from what they had learned in their conversation, they didn't think he would ever intentionally hurt his kids. Defendant agreed, "absolutely." Bilyeu then asked defendant what he thought A would say about what had happened last night. Defendant responded, just that they had had snuggles. He described "snuggles" as him kneeling next to the bed, scratching A's back. Bilyeu said his mom used to do that, and defendant said his mom did too. Turkington said, "Okay. Yeah. That seems pretty normal."

Turkington then asked defendant if it would surprise him to learn that A had said that defendant had his penis in her mouth. Defendant denied that, saying "that's not something that happened last night." The deputies asked defendant how a six-year-old child might make up an allegation like that. Defendant said that he didn't know why because he's not A, but that the children sometimes get silly and wild at bedtime. Bilyeu then asked defendant, "You said it's not something that happened last night. Um *** when did it happen?" Defendant denied that it had happened. Bilyeu asked defendant, "Where do you think she would have seen something like that or experienced something like that, that it would come out now at six years old?" Defendant then

---

"I wonder at what degree of honesty you're being with us right because I feel like you're leaving some parts out."

Turkington continued, "Just—just to protect your family. ***. Not even yourself, but your family. What—what do you think?"

explained that a month or so before, there had been an issue with A grabbing his pant leg. Defendant said he had tried to work that out with A and described her behavior as "an uncontrollable silliness."

Turkington took a different tack, first telling defendant again that the deputies did not think he was hurting his kids, and that he was still a good father "in many many ways." He suggested to defendant that there may have been a "mistake," a "lapse in judgment or something," but that that "doesn't mean you're not a good father." Turkington said that they weren't saying that defendant wanted to hurt or take advantage of his kids, but "[w]e're saying we think something inappropriate happened maybe just once." He said, "we just don't want to see this move on to where it could hurt them. *** [W]e just don't want to see them have bad experiences," like what defendant's wife's children had experienced with their father. Defendant acknowledged that that would be damaging. Turkington told defendant, "So that's—that's why we're—we're trying to make it okay that we talk about this because it—it needs to be talked about, right?" Defendant acknowledged that. The deputy told defendant that the thing that happened with A was a mistake, and something that he could move past, but that it was something that needed to be addressed so that A could get some help. "We need to get her some help, right?" Defendant acknowledged that. Turkington said, "we're just trying to address this, so we can move past it. That's really what this—really what we're talking about tonight. Would you agree?" Defendant said that he did, for the most part. Defendant once again stated, however, that his penis has not been in A's mouth. Bilyeu again then asked, "[W]here is this coming from for a six-year-old?" Defendant responded, "It's coming from her talking about probably what–the issue that we had of her tugging on my pants before and me standing over her and not working that out." Turkington asked, "Was there a time maybe that she tugged real hard on your pants and they came down?" Defendant said yes: "Yeah, she's tugged on my privates. She's tugged on my penis."[4]

---

[4] The conversation continued:

"[Turkington]:  Yeah.  Okay.

Defendant then admitted that, on five separate occasions, A had tugged on his penis.

The conversation continued a while longer. Defendant explained how he and his wife attempted to teach A that it was not appropriate to tug on defendant's penis and it was no longer an issue. Turkington and defendant then spoke for a considerable length of time about A tugging on defendant's pajama pants and pulling out his penis. Defendant once again denied that she had put his penis in her mouth. Turkington then reminded defendant of DNA testing and the need to protect A and her integrity. He told defendant that he believed he was still holding back the truth. He asked defendant how he might remedy the situation with A and his family and suggested maybe writing a letter of apology. Defendant acknowledged that.

After more than three hours, defendant said that he was tired and needed to get some rest. Turkington asked defendant if he would be willing to submit to a polygraph test. Defendant said that he would first want to seek advice.

Turkington reminded defendant that his participation in the interview and responses had been voluntary. He then placed defendant under arrest and advised him of his rights under *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966).

In ruling on defendant's motion to suppress, the trial court made thorough findings discussing each of the factors described by the Supreme Court in *State v. Roble-Baker*, 340 Or 631, 638, 136 P3d 22 (2006). The court determine that, under all the circumstances, the questioning of defendant did not become compelling until defendant said that he needed to get some rest, which was after defendant had made his incriminating statement that A had held his penis about five times.

On appeal, defendant challenges that determination; he does not challenge the admissibility of specific

---

"[Defendant]: Painfully so.

"[Turkington]: Yeah.

"[Defendant]: Yeah.

"[Turkington]: Yeah. Kids do weird things"

statements but rather contends that he was in compelling circumstances during the last hour of the interview. Article I, section 12 states in relevant part, "[n]o person shall be * * * compelled in any criminal prosecution to testify against himself." To comply with the constitutional guarantee, officers must give *Miranda* warnings before questioning "a person who is in full custody or in circumstances that create a setting which judges would and officers should recognize to be compelling." *State v. Shaff*, 343 Or 639, 645, 175 P3d 454 (2007) (internal quotation marks and citations omitted). Whether circumstances were compelling is decided from the perspective of a reasonable person in the defendant's position. *Id*. In making the determination, the court considers four nonexclusive factors: (1) the location of the encounter; (2) the length of the encounter; (3) the amount of pressure exerted on the defendant; and (4) the defendant's ability to terminate the encounter. *Roble-Baker*, 340 Or at 638. The factors are neither exclusive nor mechanically applied. *Id*. at 641. "Except in the most extreme cases, no single factor is dispositive." *State v. Heise-Fay*, 274 Or App 196, 203, 360 P3d 615 (2015).

The question for us is whether the totality of the circumstances show that "the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract"—that is, whether circumstances were as inherently compelling as an in-custody interrogation. *Roble-Baker*, 340 Or at 641; *see also Miranda*, 384 US at 467 (explaining that *Miranda* warnings were intended to counteract the "inherently compelling pressures" of "in-custody interrogations"); *State v. Vondehn*, 348 Or 462, 474, 236 P3d 691 (2010) (describing the same intention under the Oregon Constitution). It is the state's burden to establish that a defendant's unwarned statements were not compelled. *Id*. at 639. Questioning a person suspected of a crime, without more, does not create the kind of compelling circumstances that require *Miranda* warnings. *State ex rel City of Pendleton v. Woodell*, 338 Or App 85, 88-89, 565 P3d 80, *rev den*, 373 Or 815 (2025).

Whether the circumstances were compelling and required the deputies to provide *Miranda* warnings presents

a question of law that we review for legal error. *Roble-Baker*, 340 Or at 640–41. The trial court's findings of historical fact are binding if there is "any evidence in the record to support them." *State v. Reed*, 371 Or 478, 488, 538 P3d 195 (2023). In reviewing the trial court's denial of the motion to suppress, we review only the evidence presented at the suppression hearing. *State v. Norgren*, 287 Or App 165, 166, 401 P3d 1275 (2017), *rev dismissed*, 363 Or 40 (2018).

Defendant does not dispute the trial court's findings that the tone and demeanor of the interrogation were calm and conversational. But defendant contends that the detective's and deputies' calm and conversational tones were layered within coercive tactics that, as a whole were compelling, because they would make a reasonable person feel that they had to answer questions and were not free to leave.

Defendant cites the lateness of the hour, the duration of the interview, and defendant's "isolation" with the detective and deputy at the after-hours county sheriff's office. Defendant additionally argues that, despite the calm and conversational demeanor of the questioning, the interrogation tactics used would convey to a reasonable person that they could not leave until the topic of the alleged abuse had been addressed. Defendant cites the deputies' emphasis on the importance of the interview and their implication that an innocent person would want to share all the facts. Defendant describes the interview as increasingly coercive, first wearing defendant down with two hours of conversation that skirted around the issue of sexual abuse,[5] and then, after midnight, when defendant was tired, bringing up A's allegations and scaring defendant by suggesting that he could lose his children and that disputing A's allegations would be harmful to her. Defendant contends that those circumstances, together with the repeated suggestions that defendant was not telling the whole story, made the circumstances compelling.

---

[5] For example, Turkington initiated conversation about children's bodies changing, sex talk with young children, and parenting methods. At one point, the officers asked defendant about his use of pornography. The deputies also asked defendant whether he believed that any of his children had seen pornography. He did not believe so. The deputies asked defendant his thoughts about child abuse and whether a parent-child relationship could be repaired after abuse.

Considering the *Roble-Baker* factors, as discussed below, we agree with the defendant that, despite the voluntariness of defendant's participation and the calm and conversational—and almost friendly—demeanor of law enforcement throughout the encounter, the circumstances became compelling when, at a late hour and after a lengthy interview, the officers' questioning began to assume defendant's guilt.

As an initial matter, we consider defendant's arguments relating to some *potentially* compelling circumstances—the lateness of the hour, the location of the interview at the sheriff's office, and the length of the interview.

The lateness of the interview was not a tactical move by the deputies but a consequence of the report of abuse having been made late in the evening. And defendant agreed to meet the deputies at the sheriff's office, despite the hour. We attribute little significance to the lateness of the interview.

As for the location, the trial court's finding that defendant voluntarily agreed to meet the deputies diminishes the potential compelling effect of the sheriff's office. *See, e.g.*, *State v. Grimm*, 290 Or App 173, 180, 414 P3d 435, *rev den*, 363 Or 283 (2018) (the fact that the defendant voluntarily drove to the police station for the interview "lessened somewhat" the effect of the location of the interview, because "the defendant came to the station voluntarily, on his own power and at a time of his own choosing"); *State v. Barber*, 179 Or App 674, 679, 41 P3d 455, *rev den*, 334 Or 632 (2002) (no compelling circumstances where the defendant agreed to voluntarily come to the police station for questioning, and never indicated that he wanted to leave).

Additionally, before the questioning began, defendant was told that he was free to leave at any time. As found by the trial court, the detective's and deputies' demeanors were "conversational," "benign," and "gentle." And the trial court's finding that defendant voluntarily spoke with Turkington and Bilyeu (until he said that he needed rest) is supported by the record. Defendant returned to the interview room after a break. And although the Turkington and Bilyeu gave defendant opportunities to do so, defendant did

not express a desire to leave or to terminate the interview. We conclude that the voluntary nature of the encounter and the noncoercive, calm and conversational—friendly—tone of the interview weigh against a determination that the location of the interview at the sheriff's office was compelling.

The interview was long. But an assessment of the durational factor is dependent not only on its length, but on the character or quality of the interaction. *State v. Northcutt*, 246 Or App 239, 250, 268 P3d 154 (2011) (in weighing the significance of the length of the police encounter, we evaluate "the use of aggressive and coercive police interrogation practices, especially including * * * those explicitly predicated on assumptions of a suspect's guilt or calculated to contradict a suspect's assertions of innocence"). As discussed above, the interview, although lengthy, was not aggressive, coercive, or accusatory. We conclude for that reason that the length of the interview in and of itself does not weigh significantly in the calculus.

But despite the voluntary nature of defendant's participation, the officers' calm and conversational demeanor throughout the lengthy interview, and the absence of threats or promises, the interview became compelling when the officers began to imply their acceptance of the victim's account and their assumption that defendant was lying and urged defendant to acknowledge his conduct so that the issue could be dealt with. For example, Turkington suggested to defendant that he may have made a "mistake," or had a "lapse in judgment or something," but that that didn't mean that he wasn't "a good father." Turkington said that the officers weren't saying that defendant wanted to hurt or take advantage of his kids, but "[w]e're saying we think something inappropriate happened maybe just once." Turkington emphasized the need for defendant to deal with the issue: "[W]e just don't want to see this move on to where it could hurt them. * * * [W]e just don't want to see them have bad experiences," the implication being that some sexual misconduct had occurred. Turkington told defendant, "So that's—that's why we're—we're trying to make it okay that we talk about this because it—it needs to be talked about, right?" The deputy told defendant that the thing that

happened with A was a mistake and that it was something that defendant could move passed, but that it needed to be addressed so that A could get some help. Turkington told defendant that he believed defendant was holding back the truth and asked defendant how he might remedy the situation with A and his family and suggested maybe writing a letter of apology. Defendant acknowledged that. In short, the officers' interrogation assumed defendant's guilt.

As we held in *State v. Andrews*, 335 Or App 59, 68-69, 557 P3d 165 (2024), that style of interrogation rendered the circumstances compelling. There we held that, despite the officers' calm tone and demeanor, and absence of threats or promises, circumstances were compelling where officers "cast substantial doubt on defendant's story while crediting victim's accusations, called into question various inconsistencies with defendant's *** defense, used tactics to seek to get defendant to admit to a lapse in judgment and a 'mistake,' and pushed defendant to take personal responsibility for his conduct with a child in a manner that would effectively serve as a confession." *Id*. *See also Northcutt*, 246 Or App at 250 (the gravamen of the "pressure" factor is "the use of aggressive and coercive police interrogation practices, especially including, but not limited to, those explicitly predicated on assumptions of a suspect's guilt or calculated to contradict a suspect's assertions of innocence").

Although it was not problematic to confront defendant with evidence of guilt by telling defendant of A's allegations, *see id*. at 249 ("[M]ere reference to evidence of a suspect's guilt in the course of nonaggressive questioning that does not 'assume the suspect's guilt' is not sufficiently coercive to give rise to compelling circumstances."); *see also State v. Phillips*, 302 Or App 618, 631, 459 P3d 909, *rev den*, 366 Or 552 (2020) (confronting a suspect with evidence of guilt, without more, does not make circumstances compelling), here, by expressing belief that A was telling the truth and that defendant needed to admit that he had committed the alleged sexual acts so that the situation could be remedied, the officers created compelling circumstances. At that point, a reasonable person would have felt that they were no longer free to cut off the interview and leave because the

officers effectively communicated that they believed defendant was guilty of a serious crime. We therefore conclude that the trial court erred in denying the motion to suppress, because the interview was conducted under compelling circumstances, in violation of Article I, section 12.

Reversed and remanded.