Submitted January 15, 2019, affirmed March 4, petition for review denied June 4, 2020 (366 Or 552)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JACQUELINE MARIE PHILLIPS,
*Defendant-Appellant.*

### Clackamas County Circuit Court
### 16CR38468; A164790

459 P3d 909

Defendant appeals a judgment of conviction for both unlawful delivery and unlawful possession of methamphetamine, assigning error to the trial court's denial of her motion to suppress evidence obtained during a search of her residence. The search occurred after police officers engaged defendant in conversation, during which defendant invited the officers to search her residence. The officers did not provide defendant with *Miranda* warnings before the search. On appeal, defendant argues that the circumstances became compelling over the course of the conversation such that the searching officers should have given her *Miranda* warnings and, because they did not, evidence found during the search should have been suppressed. *Held*: Defendant was not in compelling circumstances during the conversation that preceded the officers' discovery of the evidence that defendant sought to suppress. Accordingly, the trial court did not err when it denied defendant's suppression motion.

Affirmed.

Katherine E. Weber, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and John P. Evans, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Christopher A. Perdue, Assistant Attorney General, filed the brief for respondent.

Before DeHoog, Presiding Judge, and Aoyagi, Judge, and Hadlock, Judge pro tempore.

HADLOCK, J. pro tempore.

Affirmed.

### HADLOCK, J. pro tempore

Defendant appeals a judgment of conviction for one count of unlawful delivery of methamphetamine and one count of unlawful possession of methamphetamine, challenging the trial court's denial of her motion to suppress. For the reasons set out below, we conclude that the trial court correctly denied defendant's motion. Accordingly, we affirm.

We set out the facts consistently with the explicit and implicit findings that the trial court made in the course of denying defendant's suppression motion, which the record supports. *See State v. Dodge*, 297 Or App 30, 33, 441 P3d 599, *rev den*, 365 Or 533 (2019) ("In reviewing the trial court's denial of defendant's suppression motion, we are bound by the trial court's findings of historical fact so long as evidence in the record supports them.").

Police officers found methamphetamine at defendant's residence, a unit in a manufactured-home park, after they visited her while searching for a stolen firearm. Officers were following up on information that another person, DK, had possession of that stolen gun; they also believed that DK, along with his father, RK, were inside another unit in the same manufactured-home park. RK had commented to multiple people that he "was thinking about committing 'suicide by cop.'"

Officer Scharmota and several others arrived at the park and attempted repeatedly to contact DK and RK at the residence where police thought they were located, initially without success. The activity drew attention from other people at the park; officers tried to direct people away from the area and to stay in their homes. Officers also learned that other people inside the residence were acquainted with defendant, who lived 50 to 100 yards away. A detective (Meade) went to defendant's residence to see if she had any information about RK's location. Defendant also learned about the police activity from a neighbor who had called to tell her about it. In the meantime, and after about 50 minutes of attempted communication, RK said he would come outside. He and DK were taken into custody without incident.

Most officers then left the scene, but some, including Scharmota, remained. RK told the officers that he had given the stolen gun to another tenant in the park—defendant— in exchange for methamphetamine. After talking with RK for about 20 minutes, Scharmota walked to defendant's unit and saw her and Meade standing on the porch outside of her door, talking. Defendant "was very relaxed" and polite; she and Meade were engaged in "non-confrontational," calm conversation. It was about 4:30 p.m. when Scharmota got to defendant's unit.

Scharmota told defendant that he had information that RK "had brought the gun to her" and traded it for drugs; he explained that police "were still looking into try- ing to figure out where this gun was." Defendant denied having any drugs or a gun in her home and invited the officers to come in and search. Scharmota said something like, "we might get to that point," but he did not tell defen- dant that she could be arrested or charged with a crime. After about 10 to 15 minutes of conversation on the porch, defendant "asked if we could go inside so she could sit down," inviting Scharmota into the residence. Scharmota described the conversation as "killing time until somebody else could come down there and assist [him] with searching the res- idence." He and defendant engaged in nonconfrontational, "very mild" and "comfortable" conversation, but Scharmota "did ask her a little bit more about the presence of guns and drugs in the house," and Scharmota "would imagine" that, in a nonconfrontational way, he had asked defendant to be honest with him or said "that we would appreciate her coop- eration and her being honest." However, Scharmota did not threaten to arrest defendant; nor did he promise her any leniency. Defendant invited Scharmota to search the resi- dence "several times." Scharmota did not search the resi- dence at that point because he was alone and without cover (at some point, Meade had left).

After Scharmota had been alone with defendant for about 15 or 20 minutes, two officers (Murphy and Green) arrived. Defendant again invited a search of her home. Murphy testified at the suppression hearing that defen- dant had "a very relaxed demeanor kind of dictated by her

own willingness" to allow the officers to search; he testified that he did not pressure her by stating that "something else would happen" if she did not consent. Scharmota began to search, starting with the bedroom. Immediately upon entering that room, he saw a baggie with a white substance that he believed to be methamphetamine. Scharmota brought the baggie into the living room and told Murphy what he had found. Murphy then asked defendant if there were any additional drugs, and defendant said she needed to use the bathroom. Murphy asked if any methamphetamine was in that room, and defendant said, "Yes, under the sink." Defendant's demeanor had not changed at that point; nor had Murphy threatened her in any way. Murphy described defendant as "kind of nonchalant." Scharmota testified that defendant "was giving off the demeanor that she was trying to help us and answer our questions and be cooperative with us."

Scharmota looked under the bathroom sink and found a "methamphetamine bong" but no drugs; he then returned to the living room and asked for more information. Defendant said there was a makeup bag under the sink, giving "pretty specific directions on where to find the drugs." Scharmota "felt [defendant] was trying to be helpful and be honest with us"; he returned to the bathroom and found a digital scale, plastic baggies, and methamphetamine in the bag that defendant had described. Defendant said that the items had been left there by one of her friends, but she acknowledged that her fingerprints would be on them. Defendant went to use the bathroom after the officers had retrieved the methamphetamine from that room; while she was there, Murphy found additional methamphetamine in the living room.

Additional conversation and questioning occurred after that point, related solely to the stolen gun, which officers eventually found in defendant's bedroom based on information that defendant had provided. At that point, Murphy told defendant that she could be lodged in jail, although the officers would not take her to jail that day, and that he would "be referring it to the District Attorney's Office." Murphy had not previously made any statements to defendant about jail or submitting the case to the prosecutor.

The officers left defendant's residence at about the same time, clearing the scene at 5:43 p.m. Scharmota had spent about an hour and 15 minutes at defendant's home at that point. During that time, Scharmota never restricted defendant's movement, he never told defendant that she could not leave the residence, and defendant never asked to leave. Murphy described the scene as having been "fluid," with a few officers coming and going, but no more than three officers in the residence at any one time. Murphy did not observe any officers make threats or arguments. Defendant remained calm throughout. Neither Scharmota nor Murphy ever read *Miranda* warnings during the encounter, and neither of them heard any other officer give those warnings.

A neighbor testified at the suppression hearing that defendant told her, after the incident, that she had been "so intimidated" by the officers who went to her home.

After being charged with possession and delivery of methamphetamine, defendant moved to suppress evidence found during the search. The trial court denied the motion, having found that defendant "volunteered to allow the law enforcement into her home and consented to a search" of "the whole place." The court also ruled that defendant had not been in compelling circumstances that necessitated *Miranda* warnings, even after "she [was] presented with the initial drugs" found by the officers. After the court denied defendant's suppression motion, she entered a conditional guilty plea and received a probationary sentence.

On appeal, defendant argues that the trial court erred when it denied her suppression motion. Defendant contends that she was in compelling circumstances and, therefore, the officers should have provided *Miranda* warnings before questioning her. According to defendant, the circumstances became compelling either when Scharmota told her that he had information that she had traded drugs for the stolen gun or when officers later discovered methamphetamine in defendant's bedroom and asked her whether additional drugs were present. In either case, defendant argues, later-discovered evidence should have been suppressed because its discovery derived from the preceding *Miranda* violation. In response, the state argues that defendant was

never in compelling circumstances and *Miranda* warnings were therefore not required. The state further argues that defendant voluntarily consented to the search of her residence and that her voluntary consent attenuated any *Miranda* violation that had occurred.

Our evaluation of the parties' arguments starts with basic principles. Article I, section 12, of the Oregon Constitution provides that "[n]o person shall be * * * compelled in any criminal prosecution to testify against himself." To protect that right against self-incrimination, police officers "must provide *Miranda* warnings to a suspect before interrogating that suspect if the suspect either is in 'full custody' or in 'compelling circumstances.'" *State v. Courville*, 276 Or App 672, 677, 368 P3d 838 (2016) (quoting *State v. Roble-Baker*, 340 Or 631, 638, 136 P3d 22 (2006)). The "overarching issue" in determining whether circumstances were compelling "is whether the questioning occurred in a 'police-dominated atmosphere.'" *State v. Turnidge*, 359 Or 364, 402, 374 P3d 853 (2016), *cert den*, 137 S Ct 665 (2017).[1] The question must be addressed from the perspective of a reasonable person in the suspect's position, considering the totality of the circumstances. *Id*. Pertinent factors include "the location of the encounter, the length of the encounter, the amount of force exerted on the suspect, and the suspect's ability to terminate the encounter." *Id*.

In this case, some of those factors weigh against a determination that the circumstances in which defendant was questioned were "compelling" or, at least, are more-or-less neutral on that point. Defendant was at her own home during her interactions with the officers. Indeed, defendant initially talked with Meade on her porch and, after Scharmota arrived, invited the officers into her home without prompting. Those facts significantly reduce the likelihood that the circumstances were inherently compelling. *See Turnidge*, 359 Or at 402 (that the defendant's encounter

---

[1] Although *Turnidge* addressed whether police officers had violated the defendant's Article I, section 12, right to counsel during custodial interrogation, it explained that the right attaches when the suspect is in custody or the same type of "'compelling circumstances' that give the right to *Miranda* protections more generally." 359 Or at 400. Accordingly, its discussion of "compelling circumstances" informs our analysis here.

with police officers occurred "at or within close proximity to his home" significantly reduced "the likelihood that the circumstances were inherently compelling for purposes of the Article I, section 12, analysis"); *State v. Shaff*, 343 Or 639, 646, 175 P3d 454 (2007) (although questioning in a person's home might be compelling under certain circumstances, "the fact that the interview occurs in familiar surroundings diminishes the police-dominated atmosphere that *Miranda* warnings were intended to counteract"). Moreover, the officers did not restrict defendant's movement. That factor, too, tends to weigh against a "compelling circumstances" determination.

Nonetheless, defendant suggests that the "significant police presence" in the manufactured-home park contributed to her being in compelling circumstances when questioned. Defendant notes that we have held that, "when a person's home becomes the location of a significant police operation, that police presence can at least tend to establish a police-dominated atmosphere in otherwise 'familiar surroundings.'" *State v. Heise-Fay*, 274 Or App 196, 203, 360 P3d 615 (2015). We are not persuaded. Police officers' confrontation with RK and DK occurred elsewhere in the manufactured-home park, away from defendant's home, and it ended before officers searched defendant's residence. The record does not establish that a reasonable person in defendant's situation would have perceived that confrontational activity to continue in association with officers' presence at her home. *Cf. Turnidge*, 359 Or 403-04 (rejecting argument that the presence of multiple officers with drawn weapons contributed to a police-dominated atmosphere, given that those officers had not been visible to the defendant).

Given the circumstances in which defendant's encounter with police officers occurred, the duration of that encounter does not weigh strongly in favor of a determination that those circumstances were "compelling" at either of the two points in time relevant to defendant's arguments on appeal—first, when Scharmota arrived at defendant's home and told her about the purported drugs-for-gun exchange or, second, when the officers later found methamphetamine in defendant's bedroom and asked her if there was more. The record does not establish exactly how long officers were

present at defendant's residence (both inside and outside), but the encounter appears to have lasted no more than a total of about two hours. Of that, 20 to 30 minutes passed before Scharmota arrived and told defendant that he had information that she had given RK drugs in exchange for the stolen gun. Under the circumstances—particularly that the encounter occurred at defendant's home and had a non-confrontational tone, as discussed below—the fact that the encounter had lasted for perhaps a half-hour at that point did not contribute to making circumstances compelling. Even later—when officers asked defendant whether she had more drugs beyond those they had discovered in her bedroom—the entire two-hour-long encounter had not yet transpired. After the officers asked defendant about the methamphetamine and she acknowledged that some was in the bathroom (the pertinent point in time), officers continued their search for drugs and then engaged in further discussion with defendant about the stolen firearm before they located the weapon. Thus, police officers had been at defendant's home for *less than* two hours when she told them about the methamphetamine in her bathroom. Although the interaction had lasted longer than a typical traffic stop by that point—a metric that courts sometimes have referenced in conducting the "compelling circumstances" analysis[2] —it nonetheless was not so long that the *duration* of the encounter (as opposed to its character) would contribute meaningfully to circumstances being compelling. *See, e.g., State v. Grimm*, 290 Or App 173, 180, 414 P3d 435, *rev den*, 363 Or 283 (2018) (circumstances were compelling, but not because of the duration of the defendant's encounter with police, which lasted no more than one and one-half hours; that period of time was "not an insignificant amount of time to undergo questioning by police officers," but "neither [was] it determinative of compelling circumstances").

We next consider factors related to the character of the encounter, rather than its mere duration. In considering "the amount of pressure exerted on the defendant during the encounter," we have acknowledged that that factor can be "fairly amorphous." *Grimm*, 290 Or App at 181. Some

---

[2] *See Shaff*, 343 Or at 646 ("[O]fficers detained defendant for only a brief period of time, no more than a typical traffic stop.").

pressure can come in the form of officers' aggressive tone or demeanor, contributing to a determination of compelling circumstances. Conversely, an officer's calm, conversational, and nonconfrontational demeanor can sometimes weigh against a compelling-circumstances determination. *See Courville*, 276 Or App at 676, 678 (no compelling circumstances where, among other things, the officer's tone was "friendly and conversational" throughout an interview that lasted over an hour; noting that "mundane" conversation that occurs in familiar surroundings tends to diminish the police-dominated atmosphere that *Miranda* warnings were intended to counteract); *State v. Schwerbel*, 233 Or App 391, 397, 226 P3d 100, *rev den*, 349 Or 172 (2010) (identifying the questioning officer's "polite and nonconfrontational" demeanor as one factor "tend[ing] to make the circumstances less compelling," although the court concluded based on other factors that the totality of the circumstances was compelling); *see also Shaff*, 343 Or at 646 (circumstances not compelling where, among other things, a police officer "did not raise his voice, threaten defendant, or engage in a show of force"). In this case, the officers' demeanor and tone remained calm and conversational throughout the encounter, and Scharmota described his initial conversation with defendant as "very mild" and as "killing time." Defendant also remained calm, cooperative, and helpful. Those facts weigh against a "compelling circumstances" determination.

The demeanor of police officers and suspects is not the only important consideration, however. Pressure can also come in the form of the specific questions that officers ask or accusations that they make. That is the focus of defendant's argument; she contends that the circumstances became compelling either when Scharmota told her that he had information that she had traded drugs for a gun, or when officers confronted her with the methamphetamine they found in her bedroom and asked if there was more. Defendant asserts that those confrontations "would have a coercive effect on a reasonable person in defendant's position, because the person would know that she could be arrested and charged with serious crimes."

Several "compelling circumstances" cases have turned on whether officers made "coercive use" of evidence of a

suspect's guilt during questioning, like defendant contends happened here. It is settled that circumstances do not become compelling simply because a suspect knows that officers have information that he or she may have committed a crime, or because officers suggest that possibility. For example, in *Shaff*, officers responded to a report of domestic abuse at the defendant's home and found an injured woman, who said that she had fallen. 343 Or at 642-43. The Supreme Court held that the officers did not create compelling circumstances when they told the defendant that they were there to make sure that the woman was safe, even when they noted that the woman had obviously been assaulted, asked the defendant "if he knew why she would say now that she had been assaulted" (which she had not actually said), and asked what the woman had done to anger him. *Id*. at 643, 646-47. The court emphasized that the officer had raised the assault issue only twice during a 10-minute conversation and had "acted in an appropriate and courteous manner in carrying out an inquiry into a citizen's welfare." *Id*. at 647-48.

Thus, "mere reference to evidence of a suspect's guilt in the course of nonaggressive questioning that does not assume the suspect's guilt is not sufficiently coercive to give rise to compelling circumstances." *State v. Northcutt*, 246 Or App 239, 249, 268 P3d 154 (2011) (internal quotation marks omitted). Nor are "questions that merely suggest that an officer is concerned about possible 'illegal activity'" usually enough to create compelling circumstances. *Heise-Fay*, 274 Or App at 204-05. Rather, what matters is "whether the officers used that [incriminating] evidence in a coercive manner." *Shaff*, 343 Or at 650. "[T]he gravamen" of the factor relating to the amount of force exerted by police "is the use of aggressive and coercive police interrogation practices, especially including, but not limited to, those explicitly predicated on assumptions of a suspect's guilt or calculated to contradict a suspect's assertions of innocence." *Northcutt*, 246 Or App at 250.

*State v. Saunders*, 221 Or App 116, 188 P3d 449, *rev den*, 345 Or 416 (2008), provides another example of police questioning that did not create compelling circumstances even though it involved confronting the suspect with

evidence of criminal activity. In that case, police officers (1) questioned the defendant for one and one-half hours at his home about allegations of child sexual abuse, (2) showed the defendant a stick-figure drawing to which the defendant reacted nervously, (3) told the defendant that the victim's allegations were credible and that she appeared to lack a motive to lie, and (4) told the defendant that they did not believe him. *Id*. at 119. We held, in light of *Shaff*, that the officers had not used the incriminating evidence *coercively* in their questioning of the defendant and that, therefore, confronting him with that evidence "did not make the circumstances compelling." *Id*. at 120.

Other cases provide contrasting examples of what may constitute coercive use of incriminating evidence during questioning of a suspect, depending on the totality of the circumstances. In *State v. Esquivel*, 288 Or App 755, 761, 407 P3d 879 (2017), we held that coercion existed when an officer told a suspect that there was sufficient evidence for arrest, including "video of her committing the crime," and gave her the choice of answering questions and receiving a citation or declining to answer questions and being arrested. Coercion may also exist when officers escalate pressure over the course of an interview, repeatedly confronting a suspect with their knowledge that she is lying, pointing out inconsistencies in her description of events, and describing evidence of her guilt. *See State v. Ford*, 244 Or App 289, 297, 260 P3d 637, *adh'd to as modified on recons*, 245 Or App 500, 263 P3d 1110 (2011) (by "persistently pressur[ing] defendant for more information in ways that assumed defendant's guilt," an officer contributed to making the circumstances of an interrogation compelling); *see also State v. Mattheisen*, 273 Or App 641, 651, 359 P3d 1218 (2015) (compelling circumstances where officers "did much more than simply confront defendant with adverse evidence" but "persisted in telling defendant that he should identify himself either as a pedophile or an 'opportunistic' individual," demonstrating "a clear intent to build pressure on defendant to confess"); *State v. Machain*, 233 Or App 65, 75, 225 P3d 75 (2009) (circumstances were compelling when officers' pressure escalated over a two-and-one-half-hour interview, which was the third interview of the defendant in less than 24 hours).

In addition, officers may create compelling circumstances if they expressly confront a suspect with evidence that the officers have probable cause to arrest the suspect, assert control over the defendant or an intention to do so, and are strongly considering the possibility of arrest. *See Heise-Fay*, 274 Or App at 205-06 (discussing cases); *see also State v. Stone*, 269 Or App 745, 752-53, 346 P3d 595 (2015) (similar).

Recently, in *Grimm*, we emphasized the significance of "escalating * * * pressure" during interrogation. 290 Or App at 183. In that case, the defendant, who was suspected of indecent exposure, was questioned at a police station for, at most, one and one-half hours. *Id*. at 177. Over the course of that interview, officers repeatedly told the defendant that his description of events was inconsistent with the complainant's account, explaining that his story did not make sense. *Id*. at 175-76. Each time an officer pointed out a discrepancy between defendant's account of events and the complainant's account, the defendant changed his version to try to make it align with the complainant's. *Id*. at 176. After that, an officer changed tactics, asking the defendant about his use of pornography and accusing him of being aroused by being around the complainant in circumstances where he might get caught. *Id*. at 176-77. The officer ultimately suggested that the defendant had a sexual addiction problem and asked him to tell her what really had happened; at that point, the defendant admitted the indecent exposure. *Id*. at 177.

On appeal, we considered whether the circumstances had *become* compelling by the time the defendant admitted his criminal conduct, noting that, at the beginning of the encounter, the officers had "simply confronted defendant with incriminating evidence—the complainant's version of events—in a noncoercive and nonaggressive manner and asked defendant for his side of the story." *Id*. at 183. We then emphasized the increasing pressure that officers applied throughout the rest of the interview:

> "However, after [the defendant] answered, [the officers] persisted, escalating the pressure on defendant to continue talking at every stage by telling him that his explanations did not make sense in light of the complainant's statement,

indicating that they did not believe him, and repeatedly asking him to explain the inconsistencies. After about the third time that the officers asked defendant to explain the discrepancies between his story and the complainant's, the questioning became more intrusive."

*Id.* at 183. Observing that the officer's questioning then turned to sexual matters, including a suggestion that the defendant had a sexual addiction problem, we concluded that the officer's "questions and remarks implicitly assumed that defendant was guilty of the charged behavior." *Id.* at 183-84. Because the police tactics went beyond "brief and noncoercive use of incriminating evidence" and instead were "calculated to contradict defendant's repeated assertions of innocence and pressure him to continue talking," we concluded that the encounter had become compelling by the point that the defendant admitted his conduct, after nearly one and one-half hours of questioning at the police station. *Id.* at 184-86. Nonetheless, we noted, the case was a "close" one. *Id.* at 180.

Considering the facts involved here in light of the cases described above, we conclude that defendant was not in compelling circumstances when Scharmota told her that he had information that she had traded drugs for a gun. At that point, defendant had been talking with Meade for less than one-half hour. When Scharmota arrived at defendant's residence and imparted the drugs-for-gun information, he did so in a noncoercive and nonaggressive manner. The record includes no suggestion of "escalating pressure" of any kind and Scharmota did not suggest that he was going to—or even could—arrest or detain defendant at that point. To the contrary, Scharmota did not even request consent to search; rather, defendant invited him to search her home, and he did not immediately accept that offer. Moreover, the circumstances became no more compelling during the one-half hour or so that passed before other officers arrived and began the search. During that time, defendant invited Scharmota into her home and they engaged in comfortable conversation. Scharmota did not make those circumstances compelling merely by "ask[ing] her a little bit more about the presence of guns and drugs in the house" and encouraging her to be honest with him, given that he did not threaten

defendant, make promises of leniency, or even take defendant up on her offers to search. Then, when other officers arrived, they began to search only after defendant once again extended an invitation. Under those circumstances, a reasonable person would not have felt that she was *compelled* to answer officers' questions or allow them to search her home.

We also conclude that the circumstances had not become compelling by the time defendant told officers that methamphetamine was in her bathroom. At that point, Scharmota had already started searching defendant's home and had almost immediately found the methamphetamine in defendant's bedroom. Murphy then asked defendant if there were any additional drugs and when, instead of responding, defendant said she needed to use the bathroom, Murphy asked whether drugs were in that room. The officers did not engage in coercive tactics by informing defendant that they had found the drugs in her bedroom and asking if there were more. Again, simply confronting a suspect with evidence of guilt in a noncoercive manner does not make circumstances compelling. *E.g., Shaff*, 343 Or at 646-48; *Northcutt*, 246 Or App at 250; *Saunders*, 221 Or App at 120. True, the "evidence of guilt" in this case was more concrete than in many others, as the officers actually had found drugs in defendant's home; they did not merely confront defendant with less-direct evidence that she had broken the law. Nonetheless, the point remains the same—the officers did not use their discovery of the drugs coercively or aggressively by asking defendant whether there were additional drugs in the residence beyond what the officers had already found. At that point, the tone of the conversation was still relaxed, and Murphy did not change his demeanor or threaten defendant in any way. Defendant's demeanor was still "kind of nonchalant." The record includes no evidence that officers traded on their initial discovery of drugs in a coercive manner; after all, defendant already had invited the officers to search her entire residence. Nothing in the record suggests that the officers exerted escalating pressure on defendant, for example by persistently accusing her of lying, pointing out inconsistencies in her story, or pressuring her to confess;

nor did officers expressly convey any intention to arrest or detain her.

In the end, the question is whether, under the totality of the circumstances, a reasonable person in defendant's situation would have felt compelled to respond to the officers' questions. Given the circumstances here—particularly including the low-key nature of the encounter, which did not include threats, promises of leniency, or accusations that defendant was lying; the fact that the encounter did not last overly long and occurred in defendant's home; defendant's repeated invitations to search her home; and the officers' few straightforward questions of defendant, which followed up on her invitations to search and were in keeping with her cooperative and helpful demeanor—we conclude that a reasonable person in defendant's position would not have felt *compelled* to respond to those questions or to allow the encounter to continue. The trial court did not err when it denied defendant's suppression motion.

In her second through fifth assignments of error, defendant challenges conditions of her probation. Defendant has been discharged from probation, she is no longer subject to the probation conditions that she challenges, and she has not identified any persisting collateral effects of those conditions. Accordingly, defendant's challenges to the probation conditions are moot and we do not address them. *See State v. Fries*, 212 Or App 220, 230, 158 P3d 10 (2007), *aff'd on other grounds*, 344 Or 541, 185 P3d 453 (2008) (declining to review challenges to expired conditions of probation).

Affirmed.