Argued and submitted January 27, 2021, affirmed February 9, 2022

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DEBORAH LYNN REED,
*Defendant-Appellant.*

Lincoln County Circuit Court
19CR12088, 18CR64481;
A170999 (Control), A171000

505 P3d 444

Defendant appeals from a judgment of conviction for various drug crimes, raising two assignments of error. In the first, defendant contends that the trial court erred in partially denying her motion to suppress statements that she made without *Miranda* warnings in violation of Article I, section 12, of the Oregon Constitution and evidence derived from that violation. In the second, she argues that the court erred in imposing a sentence of imprisonment that exceeded the statutory maximum. *Held*: Defendant was not in compelling circumstances when two officers questioned her for two minutes in the presence of her probation officer. The officers did not exert significant pressure on defendant and, given the probation officer's nonparticipation in the interview, his presence was not compelling under *State v. Dunlap*, 215 Or App 46, 57, 168 P3d 295 (2007). As to the second assignment of error, it was unpreserved, and the Court of Appeals declined to exercise its discretion to review it as plain error.

Affirmed.

Sheryl Bachart, Judge.

Morgen E. Daniels, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Shannon T. Reel, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

SHORR, J.

Affirmed.

Ortega, P. J., concurring.

**SHORR, J.**

Defendant appeals from a judgment of conviction for various drug crimes, raising two assignments of error. In the first, defendant contends that the trial court erred in partially denying her motion to suppress statements that she made without *Miranda* warnings in violation of Article I, section 12, of the Oregon Constitution and evidence derived from that violation. In the second, she argues that the court erred in imposing a sentence of imprisonment that exceeded the statutory maximum. Defendant also appeals from a judgment revoking her probation in another case, on the ground that a reversal of her convictions will require a reversal and remand of the probation revocation as well. As we explain below, we conclude that the trial court did not err in denying her motion to suppress because defendant was not in compelling circumstances when she made the unwarned statements. As to defendant's second assignment, it is unpreserved, and we decline to exercise our discretion to review it as plain error. Accordingly, we affirm.

We review the trial court's denial of a defendant's motion to suppress for legal error and are bound by the court's findings of historical fact if there is constitutionally sufficient evidence in the record to support them. *State v. Love-Faust*, 309 Or App 734, 736, 483 P3d 45, *adh'd to as modified on recons*, 311 Or App 756, 489 P3d 149 (2021). We set out the facts consistently with the trial court's explicit and implicit findings and its decision denying, in part, the motion to suppress. *Id.* Defendant was on probation in an earlier case. The terms of her probation required her, among other things, to attend meetings with her probation officer. In accordance with those conditions, defendant attended a prearranged meeting with her probation officer, Officer Eoff, at the Lincoln County Parole and Probation office to discuss her compliance with her probation.

Around the time of her meeting, Officer Bales of the Newport Police Department received information from a confidential informant that defendant had sold methamphetamine. The informant told Bales that defendant had sold drugs earlier that same day and likely still possessed drugs on her or in her car. Because Bales was responding

to another call when he received that information, he contacted Sergeant Haynes and Officer Humphreys, also of the Newport Police Department.

Haynes and Humphreys located defendant's car soon after, parked at the parole and probation office. Defendant was still inside meeting with Eoff. The officers went inside the office and found defendant in her meeting. Humphreys knocked on the door to Eoff's office, "stuck [his] head in" the doorway, and asked to speak with both Eoff and defendant. Eoff and defendant agreed, and the officers entered the office. Humphreys sat in a chair and Haynes stood near the doorway. Haynes explained "that they were there because they had information that * * * defendant was selling drugs." Haynes told defendant "that he knew she was selling drugs again and asked her how much she had on her." In response, defendant "denied having drugs on her and offered up her purse and her person for search." Haynes did not respond to defendant's offer but instead "asked [defendant] if [he] could search her vehicle, if there was any in her vehicle." Defendant denied having drugs in her car, and handed Haynes the keys to her car.

After giving her keys to Haynes, defendant "offered reasons why she was selling," explaining that she "was trying very hard" and had had difficulty finding work. Haynes told defendant that he was going outside to search her car and that Humphreys would remain inside with defendant. He explained that defendant could revoke her consent to the search "at any time" by telling Humphreys, who would notify Haynes of defendant's revocation by radio. That initial interaction lasted "approximately [two] minutes." Eoff was present but did not make any statements or ask defendant questions.

Bales arrived to help Haynes search defendant's vehicle. During the search, the officers discovered methamphetamine, heroin, and other drug paraphernalia. Meanwhile, Humphreys continued questioning defendant in Eoff's office and also in a conference room in the building. Defendant made incriminating statements. Humphreys also searched defendant's purse and phone and discovered incriminating evidence during those searches. The questioning

lasted about 30 minutes. Defendant was never advised of her *Miranda* rights. At the conclusion of the questioning and searches, defendant was arrested and charged with various crimes relating to the sale and possession of methamphetamine and heroin.

At the motion to suppress hearing, the officers testified that defendant was not required to talk to them and was free to end the questioning at any time. Eoff testified that defendant was not free to leave the parole and probation office. Once defendant arrived at the parole and probation office for her scheduled meeting, Eoff expected her to stay at the office until the meeting was complete. According to Eoff, if defendant had left the meeting early without an approved excuse, she could have violated the terms of her probation. In addition, Eoff explained that "defendant had to be escorted at all times in and out of his office or the conference room because of the rules of the [parole and probation] office."

Defendant moved to suppress the statements she made in response to the officers' questioning and the evidence discovered in her car, purse, and phone. She argued that the officers had violated her Article I, section 12, right by interrogating her in compelling circumstances without first advising her of her *Miranda* rights. She further argued that her consent to the search of her car, purse, and phone was the product of that *Miranda* violation. The state argued, in response, that *Miranda* warnings were not required because defendant was not in compelling circumstances during any part of the 30-minute encounter with Haynes and Humphreys.

The trial court determined that "the officers did not exert the type of pressure that results in a finding of compelling circumstances within the first [two] minutes of the encounter." Therefore, the court declined to suppress defendant's statements during her initial interaction with Haynes "up to the time that [Haynes] left the room with defendant's car keys," as well as the evidence discovered during the search of her car. However, the court concluded that the state had failed to prove that circumstances were not compelling during the later questioning. As a result, the

court granted defendant's motion to suppress all of the statements that defendant made after Haynes left Eoff's office, and the evidence discovered during Humphreys's searches of defendant's purse and phone.

Defendant challenges the trial court's partial denial of her motion to suppress. The parties raise substantially the same arguments on appeal as they did in the trial court. Defendant contends that she was in compelling circumstances during the initial two-minute encounter with the police and that her unwarned statements during that encounter should be suppressed. She further contends that her consent to search her vehicle was the product of that *Miranda* violation and that the evidence discovered as a result of that consent should also be suppressed.[1] The state argues that defendant was not in compelling circumstances, and that, if *Miranda* warnings were required, defendant's voluntary consent to search was attenuated from the violation such that the evidence discovered in the car is admissible.

Article I, section 12, provides that "[n]o person shall be * * * compelled in any criminal prosecution to testify against himself." To protect a person's right against compelled self-incrimination under that section, police must give *Miranda* warnings before interrogating a suspect who is in custody or compelling circumstances. *State v. Nichols*, 361 Or 101, 107, 390 P3d 1001 (2017). In determining whether compelling circumstances exist, the "overarching inquiry is whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *State v. Roble-Baker*, 340 Or 631, 641, 136 P3d 22 (2006). When so inquiring, we consider the totality of the circumstances, including the following nonexclusive factors: (1) the location of the encounter; (2) the length of the encounter; (3) the amount of pressure exerted on the defendant; and (4) the defendant's ability to terminate the encounter. *Id.* at 640-41. The "question whether the circumstances were compelling does not turn on either the officer's or the suspect's

---

[1] Defendant does not raise an Article I, section 9, challenge to the search or the voluntariness of her consent. She argues only that the consent was a product of the purported Article I, section 12, violation.

subjective belief or intent; rather, it turns on how a reasonable person in the suspect's position would have understood [the] situation." *State v. Shaff*, 343 Or 639, 645, 175 P3d 454 (2007).

Defendant primarily argues that the circumstances were compelling in the following ways. First, the encounter was in her probation officer Eoff's office, and he was present. According to defendant, a reasonable person in that position would understand that she had to answer questions and submit to a search to avoid violating her probation. Therefore, defendant asserts, the location and Eoff's presence were inherently coercive. Moreover, defendant argues that she was not free to terminate the encounter because she was required to stay at the meeting until Eoff gave her permission to leave. Second, defendant points to Haynes and Humphreys's unexpected arrival and statements confronting defendant with their knowledge of her criminal activity. Defendant argues that that behavior was pressure that, in combination with other factors, rendered the circumstances compelling. We address each of the *Roble-Baker* factors in turn, with particular focus on the third factor, the pressure exerted on defendant.

Beginning with the location of the encounter, we generally consider familiar surroundings less compelling, and unfamiliar surroundings more compelling. *State v. Grimm*, 290 Or App 173, 180, 414 P3d 435, *rev den*, 363 Or 283 (2018) (noting that "the unfamiliar, police-station setting of the interview tended—necessarily—toward a 'police-dominated atmosphere'"); *Shaff*, 343 Or at 646 ("the fact that the interview occurs in familiar surroundings diminishes the police-dominated atmosphere that *Miranda* warnings were intended to counteract"). The location of the encounter is not dispositive; even a custodial setting may not result in compelling circumstances where other factors tend the other direction. *See Roble-Baker*, 340 Or at 643 (circumstances of police questioning at police station were not compelling for first several hours, until interviewing officers engaged in coercive interrogation techniques); *Grimm*, 290 Or App at 183 (defendant not under compelling circumstances at outset of interview, despite location of interview in police station).

Here, the fact that the encounter was in Eoff's office, likely a less than familiar setting to defendant, would seemingly weigh in favor of a compelling circumstances determination. However, we have not treated a probation office as particularly compelling in our case law. In *State v. Dunlap*, the defendant was on probation, and was required to consent to searches, truthfully answer questions from his probation officer, and submit to a polygraph test every six months. 215 Or App 46, 48, 168 P3d 295 (2007). After the results of his polygraph revealed that he may have violated his probation, the defendant's probation officer arranged for a meeting in his office. During the meeting, the defendant consented to a search of his residence and his computer. The defendant made incriminating statements during the search. *Id.* at 49. Several days later, the defendant again met with his probation officer and a police officer, who interviewed the defendant about whether he had been viewing child pornography based on images found during the search of his computer. The defendant made further incriminating statements before the officers arrested him and advised him of his *Miranda* rights. *Id.* at 50. We held that the defendant was not in compelling circumstances before he was given *Miranda* warnings. That was so, we explained, because the police did not tell the defendant "that he would be penalized in terms of his probation status for invoking his constitutional privilege against self-incrimination." *Id.* at 57. We specifically concluded that the probation officer's office was not a compelling setting "notwithstanding the presence at various times of more than one officer." *Id.* Given our decision in *Dunlap*, the unfamiliar setting is not a significant factor here. That is particularly true given Eoff's lack of involvement, and the fact that defendant was there for a routine meeting, which we discuss later.

With regard to the second factor, the length of the interview, the pertinent time period is from the beginning of the officers' interaction with defendant to the moment that defendant gave consent to search her car and handed Haynes her keys. The trial court found that that initial interaction lasted only two minutes. Although not dispositive, the short duration of the interview weighs against concluding that the circumstances were compelling here.

*See State v. Northcutt*, 246 Or App 239, 251-52, 268 P3d 154 (2011) (one and one-half hour interview in motel where the defendant sold counterfeit purses not compelling).

The bulk of our analysis relates to the next factor, the pressure exerted on the defendant. Pressure exerted by an officer "can come in the form of officers' aggressive tone or demeanor, contributing to a determination of compelling circumstances. Conversely, an officer's calm, conversational, and nonconfrontational demeanor can sometimes weigh against a compelling circumstances determination." *State v. Phillips*, 302 Or App 618, 626, 459 P3d 909, *rev den*, 366 Or 552 (2020). Or, "[o]ften, the pressure comes from the police confronting the defendant with evidence of his or her guilt." *Grimm*, 290 Or App at 181. What matters "is not whether evidence of guilt was apparent to the suspect; rather, it is whether the officers used that evidence in a coercive manner." *Shaff*, 343 Or at 650. Thus, "simply confronting a suspect with evidence of guilt in a noncoercive manner does not make circumstances compelling." *Phillips*, 302 Or App at 631. Instead, we have considered an officer's use of evidence of guilt coercive where an officer has described the evidence at length, used the evidence to repeatedly confront a suspect with their knowledge that she is lying, or used the evidence to confront a suspect with probable cause to support an immediate arrest. *See id.* at 628-29 (describing cases where use of incriminating evidence during questioning was coercive).

The following two cases are particularly helpful in illustrating when an officer's use of guilt is coercive in nature. In *Grimm*, a woman reported that the defendant had "pulled his pants down and exposed himself" while installing internet service in her home. 290 Or App at 174. At an officer's request, the defendant agreed to go to the police station to discuss the reported incident. *Id.* Two officers interviewed the defendant in a meeting room near the main lobby. After the defendant explained what had happened, the officers told the defendant that his version of events was inconsistent with the complainant's. Over the course of one and one-half hours, the defendant retold his story several times, each time changing the details to more closely conform with the

complainant's version of events. After each telling, the officers confronted the defendant with inconsistencies between his and the complainant's accounts. The officers told the defendant that they did not believe he was telling the truth. *Id.* at 175-76. Eventually, the officers "changed tactics" by asking the defendant whether he watched pornography and telling him that he "had a sexual addiction problem." *Id.* at 176-77. After urging the defendant to tell them "what really happened," the defendant made incriminating statements. *Id.* at 177.

We explained that the circumstances were not compelling at the outset of the interview when the officers "simply confronted defendant with incriminating evidence—the complainant's version of events—in a noncoercive and nonaggressive manner and asked defendant for his side of the story." *Id.* at 183. However, we observed that the interview tactics became more coercive when the officers "persisted, escalating the pressure on defendant to continue talking at every stage by telling him that his explanations did not make sense in light of the complainant's statement, indicating that they did not believe him, and repeatedly asking him to explain the inconsistences." *Id.* Ultimately, we concluded that "the circumstances had evolved into a setting in which *Miranda* warnings were required" when the officers asked the defendant intrusive questions about his sexual habits. *Id.* at 184.

In *Phillips*, an officer contacted the defendant at her home after receiving information that she possessed a stolen firearm. The officer approached the defendant on her porch and told her that he had information that she had received the firearm in exchange for drugs. The defendant denied having drugs and invited the officer to search her home. 302 Or App at 620. During the search, the defendant made statements directing the officer to the location of drugs and the firearm, which the officer found in her bedroom. *Id.* at 621. We concluded that the defendant was not in compelling circumstances when the officer told her that he had information that she had traded drugs for a firearm. *Id.* at 630. We explained that the officer provided that information "in a noncoercive and nonaggressive manner" and

did not suggest that he would arrest or detain the defendant. *Id.* Likewise, the circumstances did not become compelling because of the officer's later questions about the presence of guns and drugs in the house, or the officer's statements encouraging the defendant to "be honest with him," given, among other factors, that "he did not threaten defendant [or] make promises of leniency." *Id.* at 630-31.

The circumstances here, during the initial two-minute interaction, are like the circumstances in *Phillips* and at the outset of the interview in *Grimm*, when circumstances were not yet compelling. The officers requested permission to speak with defendant and maintained a conversational tone throughout the two-minute encounter. They confronted defendant with knowledge that she was engaged in criminal activity in a noncoercive and nonaggressive manner. And, unlike the officers during the later questioning in *Grimm*, the officers here did not repeatedly confront defendant with that evidence or contradict her denials with the information they had received. Nor did the officers provide details about the source of the information. Instead, they briefly and vaguely stated that they knew defendant was selling drugs and asked her how much she had in her possession. Given the officers' attitude and lack of persistent or aggressive questioning, we disagree with defendant that the officers exerted pressure on her during the interaction.

Defendant contends that Eoff's presence also contributed to the pressure exerted. Specifically, defendant argues that, when the officers asked to speak with both defendant and Eoff together, they leveraged the pressure inherent in the conditions of her probation that required her to be truthful and consent to searches. As we explained above, the fact that an interview takes place in a probation office or in the presence of a probation officer, without more, is not treated as compelling. Indeed, in *Dunlap* the probation officer participated in questioning and called meetings in his office specifically to address criminal allegations. Although we acknowledged that a defendant in those circumstances may feel pressure to not violate probation conditions, we did not consider that pressure particularly coercive in the absence of some indication by the officers that

the defendant "would be penalized in terms of his probation status for invoking his constitutional privilege against self-incrimination." 215 Or App at 57; *see also Love-Faust*, 309 Or App at 742 (concluding same where probation officer did not communicate that there would be consequences to defendant probationer for invoking privilege).

Here, Eoff's engagement was less than that of the probation officer's in *Dunlap*. Eoff did not participate in the interview and arranged the meeting to discuss routine probation compliance, not to discuss the officers' allegations. And, as in *Dunlap*, the officers did not tell defendant that her refusal to speak with them could subject her to a violation. To be clear, we understand from *Dunlap* that the pressure not to violate probation conditions may be accounted for in determining whether and how much pressure was exerted on a defendant. However, given the purpose of the meeting, Eoff's nonparticipation, the lack of an express threat or reference to defendant's probation status, in addition to the other factors discussed above, Eoff's presence does not persuade us that the officers exerted pressure on defendant. Overall, the lack of pressure exerted by the officers during the brief encounter weighs significantly against a determination of compelling circumstances.

The last factor in our analysis, defendant's ability to terminate the encounter, weighs in favor of a compelling circumstances determination. Here, the officers testified that defendant was free to leave, but defendant needed permission from Eoff to end her interview. Eoff also testified that probationers are escorted in and out of the building. Although defendant may have been free to decline to speak with the officers, she could not simply walk out of the meeting. Because a reasonable person in defendant's position would understand that, at the very least, she could not leave until she had completed her probation compliance meeting, the fourth factor supports a determination that compelling circumstances existed. However, viewing that factor in combination with other circumstances here, including the setting, the officers' conduct, and the length of the interaction, we agree with the trial court that the circumstances were not compelling. *Northcutt*, 246 Or App at 251-52 (one

and one-half hour interview in motel room not compelling under totality of the circumstances, notwithstanding the fact that the defendant was not free to leave or terminate the encounter).

In sum, the circumstances of the initial interaction, viewed in their totality, did not produce "the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Roble-Baker*, 340 Or at 641. Therefore, we conclude that the trial court did not err in partially denying defendant's motion to suppress her statements during the initial interaction and the evidence discovered during the search of her car.

We turn to defendant's second assignment of error. She contends that the trial court's imposition of a 68-month sentence on Count 6 exceeded the statutory maximum sentence under ORS 161.605.[2] Defendant acknowledges that she did not preserve an objection to the sentence and seeks plain-error review. The state concedes the error but argues that we should decline to exercise our discretion to consider it because correction of the sentence "would not have the potential to improve defendant's position." *State v. Powell*, 253 Or App 185, 192, 288 P3d 999 (2012), *rev den*, 353 Or 714 (2013). That is so, the state argues, because the 68-month sentence on Count 6 was imposed concurrently with 68-month sentences on Count 4 and Count 5. Accordingly, a reduction in defendant's sentence on Count 6 would not reduce the length of her overall sentence. Because the judgment reflects that the court imposed the same sentence on Counts 4, 5, and 6, including prison-term length, credit for time served, and other reduction-in-sentence programming, we agree with the state. We therefore decline to exercise our discretion to consider defendant's second assignment of error.

Because we reject each of defendant's assignments of error, we affirm the judgment of conviction in Case No. 19CR12088. As a result, we also affirm the judgment revoking defendant's probation in Case No. 18CR64481.

Affirmed.

---

[2] On Count 6, defendant was convicted of a Class C felony. ORS 161.605(3) provides that the maximum term of imprisonment for a Class C felony is five years, or 60 months.

**ORTEGA, P. J.,** concurring.

I do not dispute that the majority's application of *State v. Dunlap*, 215 Or App 46, 168 P3d 295 (2007), which I authored and which defendant has not asked us to over-rule, is correct and compels the outcome here. We generally "begin with the assumption that issues considered in our prior cases are correctly decided, and [that] the party seeking to change a precedent must assume responsibility for affirmatively persuading us that we should abandon that precedent." *Farmers Ins. Co. v. Mowry*, 350 Or 686, 698, 261 P3d 1 (2011) (internal quotation marks omitted); *Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to on recons*, 187 Or App 472, 68 P3d 259 (2003) (stating that it is not our "proper function to make or develop a party's argument"). Nevertheless, I write separately to address what I now believe to be flaws in the legal reasoning underlying *Dunlap*'s holding.

In that case, the defendant was on probation following convictions for, among other charges, encouraging child sexual abuse, and he was required to comply with the conditions of the "sex offender package," including that he consent to searches "of his person, vehicle, and property without a warrant" if his probation officer had "a reasonable ground to believe that the search would disclose evidence of a violation," truthfully answer questions from his probation officer, and submit to a polygraph test every six months. *Dunlap*, 215 Or App at 48. Following a polygraph examination where the defendant admitted to viewing adult and child pornography, his probation officer summoned the defendant to his office. The defendant complied, and his probation officer, with another officer "standing nearby," questioned him about the details of his pornography viewing. The defendant made admissions, and, at one point, both officers left the defendant in the office to "run a computer search." After they returned, the probation officer obtained the defendant's consent to search his computer and home for pornography. The defendant, the probation officer, a second parole and probation officer, and an office intern drove with the defendant in a county car to his home, where they were met by a police officer. After the defendant signed a consent form, the

probation officer seized the hard drive of his computer and transferred it to the police officer, who took it to the police department for examination. *Id.* at 49.

Following a search of the hard drive, a police officer informed the defendant's probation officer that child pornography was found on it. *Id.* at 50. As a result, the probation officer and the police officer again met with the defendant. In that meeting, both the probation officer and the police officer questioned the defendant about whether he had been viewing child pornography, and he made incriminating statements. The officer eventually read the defendant his *Miranda* rights, and he was arrested. *Id.*

In the appeal of his conviction, the defendant argued that the trial court had erred in denying his motion to suppress, because his consent to the warrantless searches was involuntary under Article I, section 9, and his *Miranda* rights were violated when his probation officer and the law enforcement officers questioned him under compelling circumstances before providing *Miranda* warnings. *Id.* at 52, 55.

With regard to his Article I, section 9, challenge, the defendant argued that his consent to the search was involuntary, because the record showed that he believed the search was inevitable and that he was subject to a probation sanction and also immediate arrest and incarceration if he did not consent. *Id.* at 52. The state disagreed, noting that, "although the probation officer informed defendant that, if he did not consent, he would probably go to jail, *** that threat reasonably should have been understood to mean that he would be taken into custody for the purposes of probation violation proceedings," because, under *Minnesota v. Murphy*, 465 US 420, 104 S Ct 1136, 79 L Ed 2d 409 (1984), his probation could not lawfully be revoked for the assertion of a constitutional right. *Dunlap*, 215 Or App at 53. We agreed with the state, explaining that, although the defendant emphasized "what he describes as his reasonable belief that he would immediately be arrested if he declined to consent," under *State v. Davis*, 133 Or App 467, 891 P2d 1373, *rev den*, 321 Or 429 (1995), the "'pressure' not to violate the conditions of his probation *** was not sufficient" coercion

to render his consent involuntary under Article I, section 9. *Dunlap*, 215 Or App at 55; *see also id.* at 54 ("In determining whether a probationer who was subject to a condition of probation that required him to submit to a search voluntarily consented to a search, we consider whether the probationer was effectively denied a reasonable opportunity to refuse the search or whether the environment was sufficiently coercive to preclude him from doing so.").

We then turned to the defendant's Article I, section 12, argument and, with minimal analysis, concluded that "the circumstances in which defendant made his pre-*Miranda* statements were not sufficiently compelling to violate Article I, section 12." *Id.* at 57. We stated:

> "In particular, nothing in the record indicates that the police told defendant that he would be penalized in terms of his probation status for invoking his constitutional privilege against self-incrimination. Nor were any of the settings, including [the probation officer's] office and defendant's apartment, in which he was questioned compelling, notwithstanding the presence at various times of more than one officer."

*Id.*

I do not find fault with the majority's application of *Dunlap* to the facts of this case. In *Dunlap*, the probation officer initiated the investigation after learning that the defendant could be in violation of his probation conditions and collaborated with a criminal investigation based on that same conduct, effectively exercising a degree of control over the defendant's involvement in both investigations. And, because "nothing in the record indicate[d] that the police told defendant that he would be penalized in terms of his probation status for invoking his constitutional privilege against self-incrimination," we concluded that *Miranda* warnings were not required. *Id*. Here, Eoff was not involved in the officers' criminal investigation of defendant as was the probation officer in *Dunlap*, and the police also did not expressly communicate that, if defendant did not cooperate with the investigation, she could be penalized in terms of her probation status. It follows that *Dunlap* compels our conclusion that Eoff's presence, when considered along with the

other factors outlined in *State v. Roble-Baker*, 340 Or 631, 640-41, 136 P3d 22 (2006), and the totality of the circumstances, did not create sufficiently compelling circumstances under Article I, section 12, requiring *Miranda* warnings.

Defendant, perhaps because she understands that it ultimately controls the outcome here, does not attempt to distinguish *Dunlap* in her briefing. Nonetheless, defendant's arguments account for the reality of the circumstances at issue in this case in a way that we failed to acknowledge in *Dunlap*. That is, where two police officers interrupt a probationer's meeting with her probation officer, state that they are there for the purpose of talking to *both* the probation officer and the defendant, proceed to question her in front of the probation officer, and then confront her with evidence that she sold drugs that same day and is currently in possession of drugs—all conduct that would also violate her probation conditions—it makes sense that the probationer would have understood, whether the words are spoken or not, that she could be found in violation of her probation if she asserted her constitutional rights not to cooperate with the investigation. Defendant's arguments point to flaws in the legal reasoning articulated in *Dunlap*, and it feels important for us to engage those flaws.

To begin, *Dunlap*'s focus on what the state actors *expressly* communicated to the defendant regarding his probation status[1] was too limited. Although what is expressly communicated is relevant to what a reasonable probationer would understand about the risks to her probation status if she fails to cooperate with an investigation, other evidence, including what a state actor implicitly communicates by words or conduct, is also relevant to that inquiry. *See State v. Tenbusch*, 131 Or App 634, 643, 886 P2d 1077 (1994), *rev den*, 320 Or 587, *cert den*, 516 US 991, 116 S Ct 523, 133 L Ed 2d 430 (1995) ("'[I]f the State, *either expressly or by implication*, asserts that invocation of the privilege [against

---

[1] *See, e.g.*, *State v. Love-Faust*, 309 Or App 734, 742, 483 P3d 45, *adh'd to as modified on recons*, 311 Or App 756, 489 P3d 149 (2021) (citing *Dunlap* in support of the conclusion that the circumstances were not sufficiently compelling to require *Miranda* warnings, in part, because the probation officer "did not communicate that there would be consequences to defendant's probation status if he invoked his constitutional privilege against self-incrimination").

self-incrimination] would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.'" (Quoting *Murphy*, 465 US at 435 (emphasis added; other emphasis in *Murphy* omitted).)); *see also State v. Backstrand*, 354 Or 392, 399, 401, 313 P3d 1084 (2013) (for purposes of determining whether a reasonable person would believe she was seized under Article I, section 9, "[e]xplicitly or implicitly, an officer must convey to the person with whom he is dealing, either by word, action, or both, that the person is not free to terminate the encounter or otherwise go about his or her ordinary affairs"). Because we failed to account for the impact of a state actor's implicit communications on what a defendant understands, our analysis in *Dunlap* was incomplete and, consequently, legally flawed.

Moreover, our focus on the omission of an express threat led us to minimize the ways in which the state actors might have implicitly communicated the equivalent of a threat to the defendant's probation status if he had asserted his constitutional rights to cooperate with the investigation. For example, in *Dunlap*, the state acknowledged that the defendant's "probation officer informed defendant that, if he did not consent [to the search], he would probably go to jail." 215 Or App at 53. In concluding that that threat was not sufficiently coercive to impact the voluntariness of the defendant's consent under Article I, section 9, we interpreted that threat as consistent with the probation officer exerting pressure on the defendant not to violate the conditions of probation. *Id.* at 55 (so expressing). Yet, the comment could also be read as a threat that, if the defendant asserted his constitutional right to not consent to a warrantless search, he could be sanctioned for violating his probation, thus compelling his cooperation. Even if that threat, which expressly mentioned jail and did not expressly mention a probation sanction, is more properly viewed as ambiguous, we nevertheless failed to engage the possibility that an implicit communication of a threat could impact the voluntariness of the defendant's consent or whether compelling circumstances existed.

Finally, our analysis in *Dunlap* failed to appreciate the realities of how a reasonable probationer in the defendant's circumstances "would have understood his or her situation." *State v. Shaff*, 343 Or 639, 641, 645, 175 P3d 454 (2007). As we have recognized, the issue for purposes of determining whether circumstances were sufficiently compelling to require *Miranda* warnings is "how a reasonable person *in [the] defendant's position* would have understood the circumstances of his questioning." *State v. Breazile*, 189 Or App 138, 146, 74 P3d 1099 (2003) (emphasis in original). *See also id.* (noting that the defendant's status as a prisoner and his understanding of the rules governing that status are relevant to that determination). Our analysis in *Dunlap*, which focused on the omission of an express threat related to the defendant's probation status, the number of officers present, and the settings in which the defendant was questioned, failed to consider the range of ways in which a reasonable probationer in the defendant's situation might have felt compelled to cooperate with his probation officer and the law enforcement officers, given his status as a probationer. *See Breazile*, 189 Or App at 146-47 (concluding that circumstances were sufficiently compelling to require *Miranda* warnings following the discovery of drugs on the defendant's property during his incarceration, where he was questioned by three correctional officers "concern[ing] an administrative violation involving possible criminal conduct," and the defendant could have been administratively sanctioned if he had refused to report to the location in the jail where the officers questioned him); *State v. Goree*, 151 Or App 621, 637, 950 P2d 919 (1997), *rev den*, 327 Or 123 (1998) ("[T]he focus is * * * on the extent to which the particular circumstances of the questioning create an environment in which the suspect reasonably will feel compelled to answer the questions of the police." (Emphasis omitted.)). The facts of *Dunlap* implicate similar concerns, with which we did not sufficiently engage, including the degree of the probation officer's involvement in the criminal investigation while simultaneously, based on the same evidence, conducting the probation-violation investigation, and also what a reasonable probationer would typically understand about the rules governing his status.

We will typically overrule a prior opinion only upon request, *Farmers Ins. Co.*, 350 Or at 698, and no such request has been made here. While I concur in the disposition under existing case law, I write to encourage us to engage more completely in future cases with the realities faced by defendants in circumstances such as these.